KAHN, J.T.C.
This is the court’s determination of a tax appeal filed by plaintiff, Universal Folding Box Co., against the City of Hoboken. The various complaints for the tax years in question (1994 through 1998), describe the subject property solely as Block 106, Lot l.[1]
The subject property contains an industrial building situated on 3.51 acres of land. Taxpayer operates its business on the entire parcel, which also includes Block 111, Lot 3. At all times relevant to these appeals Block 111, Lot 3 was owned by Ruth Batkin, and upon her death, the Estate of Ruth Batkin (“Batkin”). Taxpayer used Block 111, Lot 3 solely for parking. None of the complaints under review name Ruth Batkin or Batkin as a plaintiff, and specifically, none of the complaints itemize or describe Block 111, Lot 3, as a parcel under appeal. The Batkin parcel is a separate line item, with its own assessment apart from Block 106, Lot 1. The Batkin parcel was the subject of Tax Court judgments for 1994, 1995, 1996, 1997, and a judgment was entered at the Hudson County Board of Taxation for 1998.
The assessment appealed for each of the five years at issue regarding Block 106, Lot 1 is follows:
1994 Land $3,522,300
Improvements 2,279,000
Total $5,801,300
1995 Land $3,522,300
Improvements 2,279,000
Total $5,801,300
1996 Land $3,522,300
Improvements 1,197,700
Total $4,720,000
1997 Land $3,522,300
*144 Improvements 1,197,700
Total $4,720,000
1998 Land $3,522,300
Improvements 1,197,700
Total $4,720,000
For the same years, the judgments on the Batkin lot (Block 111, Lot 3) were as follows:
1994 ' Land $200,000
Improvements 10,000
Total $210,000
1995 The Tax Court complaint was dismissed, reinstating the original assessment:
Land $245,000
Improvements 10,000
Total $255,000
1996 Land $200,000
Improvements 10,000
Total $210,000
1997 Land $200,000
Improvements 10,000
Total $210,000
1998 Land $200,000
Improvements 10,000
Total $210,000
At the outset of the trial, the municipality moved to dismiss taxpayer’s complaint, alleging that the 1994-1998 complaints listed only Block 106, Lot 1, as the property under appeal. None of the complaints named either Ruth Batkin or the Estate of Ruth Batkin as a plaintiff. Additionally, the municipality contended that property still owned by the named taxpayer herein actual *145 ly contained more lots than Block 106, Lot 1, which, in fact, was the case. Even though the property owned by the named plaintiff-taxpayer contains multiple block and lot numbers, including Block 106, Lot 1, the assessment is identified as a line item for Block 106, Lot 1. As such, any error in the complaint was merely technical, and the municipality was on notice that the entire parcel owned by the named plaintiff herein (Universal Folding Box Co.) is under review'. With respect to Block 111, Lot 3, the Batkin parcel, a separate assessment existed. For reasons set forth on the record at the time of trial, this court denied the municipality’s application to dismiss plaintiffs complaint. At this time, this court amends and alters its determination. This court dismisses the complaint with respect to the Batkin parcel because said parcel was separately assessed, and in fact, was the subject of prior determinations by either the Tax Court or the Hudson County Board of Taxation. As hereinafter set forth, this court is able to review' the entire property, inclusive of the Batkin lot (Block 111, Lot 3) and extract the appropriate value for Block 106, Lot 1.
In addition, taxpayer moved at the outset of trial to suppress the municipality’s answering pleadings and further sought an order prohibiting the municipality from presenting any witnesses or evidence in support of a valuation estimate. This application was based upon the fact that the municipality’s failure to answer interrogatories. For the reasons set forth on the record at trial, this court granted taxpayer’s motion, suppressed the municipality’s pleadings and permitted the municipality to only cross-examine taxpayer’s witnesses. The municipality was, therefore, precluded from presenting any evidence at trial on the issue of valuation.
The property under review by this court consists of 3.51 acres of land, and a total of 119,723 square feet of improvements. The Batkin lot, which is separately assessed, and not identified in the complaint, occupies a small portion of the 3.51 acres under review. Of the 119,723 square feet of improvements, 8,550 square feet consist of second floor space. The improvements were originally constructed in 1920, with various additions in 1947 and 1981. *146 According to taxpayer’s expert appraisal witness, the weighted chronological age of the improvements is circa 1948.
Taxpayer’s expert appraisal witness was the only witness in the case. He utilized the income capitalization and market sales approaches to value the subject property. He testified that by reason of the age and condition of the improvements, the cost approach would not be useful. He arrived at an estimate of value of the subject property for each year in question by using the income capitalization approach, in the amount of $2,563,364. Utilizing the market sales approach, he valued the property for each year in question at $2,750,000. He indicated that the income capitalization approach was the primary basis for his total valuation, according little (if any) weight to the market sales approach, and concluded a value for the subject property of $2,600,000 for each of the five years at issue. This court finds that the income capitalization approach provides the only reliable method to value the subject property.
Taxpayer’s expert witness fust analyzed eight purported comparable rental properties. He displayed personal knowledge and familiarity with both the comparables and the subject. He made adjustments between same for the date of the inception of comparable leases, as well as for the length of the leases. He further adjusted for location, land-to-building ratio, ceiling clearance, age, and condition. Taxpayer’s expert witness concluded that after adjustments, the 111,173 square feet of ground floor space commanded a market rent of $3.00 per square foot for each year at issue. For the 8,550 square foot second floor space, taxpayer’s expert witness decided on a market rent of $2.40 per square foot, essentially opining that second floor space has 20% less market value than first floor space. 'Utilizing a weighted average of the ground floor and second floor space, taxpayer’s expert witness concluded that for the entire 119,723 square feet of leasable space, market rent would be $2.97 per square foot for all five years in question. By calculation, this results in potential gross income (PGI) in the amount of $356,039.
*147 Based upon taxpayer’s expert witness’ experience and knowledge of the industrial real estate market in Hudson County, he concluded that a 10% vacancy and collection loss factor should be deducted from PGI to achieve effective gross income (EGI) in the amount of $320,436. The witness further deducted operating expenses as follows:
Management - 4% of EGI - $12,817
Allowance for replacements - 15c per s.f. $17,958
Leasing commissions - 5% of EGI $16,022
Miscellaneous (inclusive of professional fees) - 1% of EGI $ 3,204
Total $49,991
Deducting the operating expenses from EGI ($320,436) produces net operating income (NOI) in the amount of $270,435 for each of the five years in issue.
In arriving at a capitalization rate, taxpayer’s appraisal expert relied most heavily on certain appraisal indicators, copies of which were attached to his report. He utilized Korpacz, R'ERC (Real Estate Research Corporation), as well as The Appraisal News, December 1995. From the information published in these reports, taxpayer’s appraisal expert concluded that a potential investor for the subject property could obtain a first mortgage at 9% per annum, with a 20-year amortization for 70% of the total value of the property. He also concluded that an investor’s own funds would be required for 30% of the purchase price. An investor could expect a return on that cash investment in the amount of 10% per annum. Taxpayer’s appraisal expert concluded that the appropriate capitalization rate would be derived as follows:
1. 70% first mortgage («) 9.00% with a 20 year amortization — constant— .1079 x .70 = .0755 ,
2. 30% equity investment @ 10.00% equity dividend rate (.30 x .1000) = .0300
Overall capitalization rate .1055
Dividing the capitalization rate (.1055) into net operating income ($270,409) produces a value in the amount of $2,563,118, as testi *148 fied to by taxpayer’s expert witness, which he rounds to $2,600,000 for each year in issue.
As herein above set forth, the municipality was not permitted to produce any evidence or testimony to refute the testimony and opinions rendered by taxpayer’s appraisal expert. No documents were permitted on behalf of the municipality on the issue of valuation. The municipality failed to produce any inconsistencies or other flaw in the testimony of taxpayer’s appraisal expert on cross-examination. One exception is that the witness was cross-examined with respect to a prior appraisal report submitted for the subject property for tax years 1994, 1995 and 1996. This report was filed with the court as well as with the municipality. Taxpayer’s appraisal expert acknowledged that he estimated a higher value for Block 106, Lot 1, in the first filed report, even though his evaluation of the property did not include the land actually owned by Batkin. At trial, this witness indicated a lesser value for the subject property, inclusive of the Batkin lot. Taxpayer’s appraisal expert testified that the prior appraisal was hastily drafted, and upon later reflection, he determined that the prior appraisal was inaccurate, and ultimately, he authored P-1 in evidence, an appraisal report covering tax years 1994 through 1998. This court determined during the trial that the testimony on cross-examination would only be considered with respect to its effect on the expert witness’ credibility. References to the prior appraisal report would not be permitted as a competing estimate of value on behalf of the municipality, based upon this court’s ruling at the outset that, by reason of the municipality’s failure to respond to interrogatories, the municipality would be precluded from submitting any affirmative evidence of value. For this same reason, the prior appraisal report, which had a different value estimate than P-1 in evidence, would not be permitted into evidence.
This court accepts taxpayer’s appraisal expert’s analysis and value estimate for the subject property. The fact that on an earlier occasion this witness came to a different conclusion does not render his current appraisal methodology unreliable. Taxpay *149 er’s appraisal expert first utilized appropriate comparable rental properties, made typical adjustments between the comparables and the subject to arrive at an estimate of potential gross income. Taxpayer’s appraisal expert’s finding, that a 10% vacancy and collection loss should be deducted from potential gross income, is not refuted and is not an unusual vacancy and collection loss factor. The appraisal expert’s itemization of expenses is within normal limits without overreaching and likewise, is unrefuted. In arriving at a capitalization rate, taxpayer’s expert witness used publications normally utilized by appraisal experts in determining the appropriate mortgage interest rate and equity return rate factors. Such reports are normally permitted as evidence in Tax Court proceedings.
For the foregoing reasons, this court finds taxpayer’s appraisal expert’s uncontroverted analysis reliable and finds the appropriate value of the subject property (inclusive of the Batkin lot) to be $2,600,000 for each tax year in question (1994 through 1998).
The average ratios for the City of Hoboken relevant to this case are as follows:
1994 Tax Year
Upper Limit 100.00%
Average Ratio 108.44%
Lower Limit 85.00%
1995 Tax Year
Upper Limit 100.00%
Average Ratio 105.27%
Lower Limit 85.00%
1996 Tax Year
Upper Limit 100.00%
Average Ratio 104.38%
Lower Limit 85.00%
1997 Tax Year
Upper Limit 100.00%
Average Ratio 98.85%
Lower Limit 84.02%
1998 Tax Year
*150 Upper Limit 100.00%
Average Ratio 93.09%
Lower Limit 79.12%
To determine the value of Block 106, Lot 1 (exclusive of the Batkin lot), the value of the Batkin lot must be subtracted from the entire property’s value found by this court to be $2,600,000. The calculation is simple with respect to 1994, 1995, and 1996. The average ratio for the City of Hoboken exceeds the county percentage level (100%). Therefore, the assessments for the Batkin lot are equivalent to the value of same as found by prior Tax Court and county tax board judgments. Those values, as hereinafter listed, may be deducted directly from $2,600,000 to derive true value for solely Block 106, Lot 1, for the years 1994, 1995, and 1996. For 1997 and 1998, the average ratio for the City of Hoboken falls below 100% (98 .85% for 1997 and 93.09% for 1998). To calculate the value of the Batkin lot, which would then be deducted from the value of the total property, the assessment for the Batkin lot for 1997 and 1998 must be divided by the appropriate average ratio, which will produce true valué for each of those years. See Jaydor Corp. v. Millbum Tp., 17 N.J., Tax 378 (1998), aff'd 18 N.J. Tax 655 (App.Div.2000); Purex Corp. v. Paterson, 8 N.J. Tax 121 (Tax 1986), Mobil Oil Corp. v. Greenwich Tp., 9 N.J. Tax 123 (Tax 1986). For 1997, the Tax Court judgment of $210,000 -t- 98.85% = $212,443, which this court rounds to $212,440. For 1998, the county tax board judgment of $210,000 -5- 93.09 = $225^589. Accordingly, by this methodology, values for Block 106, Lot 1, for each year in issue are calculated as follows:
True value for property Less true value for Block True value for Block 106, under review, Block 106, 111, Lot 3 (Batkin) Lot 1
Lot 1 and Block 111, Lot 8 (Batkin)
1994 $2,600,000 $210,000 $2,390,000
1995 2,600,000 255,000 2.345.000
1996 2,600,000 210,000 2.390.000
1997 2,600,000 212,440 2,387,560
1998 2,600,000 225,590 2,374,410
*151 This court’s task, after determining true value for Block 106, Lot 1, is to determine whether chapter 123 relief is warranted.
For each of the five years in issue, the ratio of the assessment appealed from to this court’s finding of true value is well in excess of 100%, requiring relief pursuant to N.J.S.A. 54:51A-6. For 1994, 1995, and 1996, the average ratio, as promulgated by the Director, Division of Taxation, exceeds 100% (county percentage level). Since the ratio of the assessment appealed from to this court’s finding of true value also exceeds 100% for those three years, N.J.S.A 54:51A-6c applies:
c. If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property.
[N.J.S.A. 54:51A-6b.]
Accordingly, the assessment for 1994, 1995, and 1996, pursuant to the application of chapter 123, is $2,390,000 for 1994, $2,345,000 for 1995 and $2,390,000 for 1996.
For 1997 and 1998, the ratio of assessment to true value, as found by this court, is still above 100%. The average ratio for 1997 is 98.85% and for 1998 is 93.09%. For both 1997 and 1998, N.J.S.A. 54:51A-6b applies, which states:
b. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
[N.J.S.A. 54:51A-6b.]
For 3997, applying the average ratio of 98.85% to this court’s finding of true value in the amount of $2,387,560, produces an assessment of $2,360,103, which this court rounds to $2,360,100.
For 1998, applying the average ratio of 93.09% to this court’s finding of true value in the amount of $2,374,410, produces an assessment in the amount of $2,210, 338, which this court rounds to $2,210,340.
In arriving at a final judgment for the five years in issue, this court’s determination of the assessment for the subject prop *152 erty must be allocated as between land and improvements. This court finds that the appropriate allocation between land and improvements should be in the same proportion as in the assessment appealed from. With respect to the assessment appealed from, land constituted 68% (rounded) of the total assessment, while improvements accounted for 32% (rounded) of the assessment.
Applying the aforementioned ratio to this court’s finding as to the appropriate assessment for Block 106, Lot 1, for all tax years in issue, this court requests the Tax Court Administrator to enter judgment revising the appropriate assessments as follows:
1994
Land $L625,200
Improvements 764,800
Total $2,390,000
1995
Land $L594,600
Improvements 750,400
Total $2,345,000
1996
Land $L625,200
Improvements 764,800
Total $2,390,000
1997
Land' $1,604,868
Improvements 755,232
Total $2,360,100
1998
Land $1,503,031
Improvements 707,309
Total $2,210,340

 This property, known as Block 106, Lot 1, also includes Block 106, Lots 2 through 32, Block 111, Lots 2 and 4-14.1, all of which comprise one assessment line item (Block 106, Lot 1), which lot is described m plaintiffs complaint.