**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| PORTER, HERBERT R., JR., c/o HOWARD PRESS, | ) ) ) | TAX COURT OF NEW JERSEY DOCKET NO. 007285-2009 DOCKET NO. 015636-2010 |
| Plaintiff, | ) ) | DOCKET NO. 014384-2011 |
| v. | ) ) | |
| BOROUGH OF ROSELLE, | ) ) | |
| Defendant. | ) ) | |
| BJS ASSOCIATES, c/o HOWARD PRESS, | ) ) ) | TAX COURT OF NEW JERSEY DOCKET NO. 007284-2009 DOCKET NO. 015726-2010 |
| Plaintiff, | ) ) | DOCKET NO. 014386-2011 |
| v. | ) ) | MEMORANDUM OPINION |
| BOROUGH OF ROSELLE, | ) ) | |
| Defendant. | ) ) | |

Decided: February 13, 2018

M. Sidney Donica, Esq., for plaintiff (Brach Eichler, LLC, attorneys)

Robert F. Renaud, Esq., for defendant (Palumbo, Renaud & DeAppolonio, LLC, attorneys)

DeALMEIDA, J.T.C.

This is the court's opinion after trial in the above-referenced matters challenging the local property tax assessments on real property for tax years 2009, 2010, and 2011. For the reasons stated more fully below, the assessments are reduced for tax years 2009 and 2010, and affirmed for tax year 2011.

I. Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

These appeals concern two parcels of real property in Roselle Borough, Union County. One parcel is designated in the records of the borough as Block 5301, Lot 1, and is commonly known as 470 West First Avenue. The other parcel is designated in the records of the borough as Block 5301, Lot 2, and is commonly known as 450 West First Avenue. The parties agree that the two parcels are used as a single economic unit as a print shop, warehouse, and related offices by a tenant, Howard Press, a wholly-owned subsidiary of Federal Express.[1]

The combined parcels constitute 3.7 acres and are improved with two interconnected buildings with a total of 65,222 square feet of rentable space. The structures, built in 1945, with an addition constructed in 1947, are one-story with approximately 12-14 feet ceilings. The buildings contain office space, warehouse space, and assembly space. Overall, the buildings are in average condition and are of fair quality. Four loading docks, two on each side of the buildings, can accommodate tractor trailers. Two loading docks in the front of one of the buildings can accommodate only box trucks. The office space was last renovated in the 1970s. The ceilings in the warehouse area are too low to facilitate modern standards for storage at a distribution center. They instead are sufficient for storage associated with light industrial and commercial uses.

The buildings are air conditioned and heated, with ducted venting of heat from some areas, and portions of the buildings are equipped with an air filtration system. The air filtration system

---

[1] Although the two parcels were owned by different entities on the relevant valuation dates, those entities were controlled by the same individuals. Neither party argues that the distinct ownership of the parcels poses an obstacle to having the properties valued as a single economic unit. See Universal Folding Box Co. v. City of Hoboken, 19 N.J. Tax 141 (Tax 2000), aff'd, 351 N.J. Super. 227 (App. Div.), certif. denied, 174 N.J. 545 (2002).

was the focus of a significant amount of trial testimony. The municipality's expert opined that the system was a significant characteristic of the subject property. He relied on the existence of the system, which he suggested is necessary for printing, as a basis for his opinion that the subject property's highest and best use is for rental to a tenant who operates a printing enterprise. Plaintiff's expert, on the other hand, viewed the air filtration system as equipment installed by the current tenant at the subject property to suit the needs of its business operations, and not as a significant feature of the buildings. He offered the opinion that the system had no influence on the subject property's highest and best use, which he opined to be as a rental property for any light industrial or commercial uses.

The parcels are zoned for industrial and commercial uses and sit between a two-lane road and railroad tracks along the municipal boundary with Roselle Park Borough. There are single-family homes across the street from the subject property. While the parcels are not far from several major arteries, the path from the subject property to those thoroughfares runs through residential and commercial areas with two-lane streets and traffic signals, making the subject property inferior to industrial properties with direct, or less congested, access to major highways. There is adequate on-site parking at the subject property.

For tax years 2009 through 2011, Block 5301, Lot 1 was assessed as follows:

| Land | $240,000 |
| Improvement | $629,100 |
| Total | $869,100 |

The Chapter 123 average ratio for the municipality for tax year 2009 is 42.32%. When the average ratio is applied to the assessment, the implied equalized value of the parcel for that tax year is $2,053,639 ($869,100 ÷ .4232 = $2,053,639).

3

The Chapter 123 average ratio for the municipality for tax year 2010 is 43.22%. When the average ratio is applied to the assessment, the implied equalized value of the parcel for that tax year is $2,010,875 ($869,100 ÷ .4322 = $2,010,875).

The Chapter 123 average ratio for the municipality for tax year 2011 is 47.07%. When the average ratio is applied to the assessment, the implied equalized value of the parcel for that tax year is $1,846,399 ($869,100 ÷ .4707 = $1,846,399).

For tax years 2009 through 2011, Block 5301, Lot 2 was assessed as follows:

| Land | $419,500 |
|---|---|
| Improvement | $530,400 |
| Total | $949,900 |

The Chapter 123 average ratio for the municipality for tax year 2009 is 42.32%. When the average ratio is applied to the assessment, the implied equalized value of the parcel for that tax year is $2,244,565 ($949,900 ÷ .4232 = $2,244,565).

The Chapter 123 average ratio for the municipality for tax year 2010 is 43.22%. When the average ratio is applied to the assessment, the implied equalized value of the parcel for that tax year is $2,197,825 ($949,900 ÷ .4322 = $2,197,825).

The Chapter 123 average ratio for the municipality for tax year 2011 is 47.07%. When the average ratio is applied to the assessment, the implied equalized value of the parcel for that tax year is $2,018,058 ($949,900 ÷ .4707 = $2,018,058).

Because the parcels are operated as a single economic unit, the aggregate true market value of the parcels is determined for purposes of analyzing the validity of the assessments. See Jaydor Corp. v. Township of Millburn-Short Hills, 17 N.J. Tax 378 (Tax 1998); N.J.S.A. 54:51A-6. The aggregate implied equalized value of the two parcels for each year is summarized as follows:

4

| Tax Year | Block 5301, Lot 1 | Block 5301, Lot 2 | Total |
|---|---|---|---|
| 2009 | $2,053,639 | $2,244,565 | $4,298,204 |
| 2010 | $2,010,875 | $2,197,825 | $4,208,700 |
| 2011 | $1,846,399 | $2,018,058 | $3,864,457 |

Plaintiff challenged the assessments on the parcels for each tax year, either through a direct appeal to this court (tax year 2009), or by first appealing to the Union County Board of Taxation, and, after receiving Judgments affirming the assessments, to this court (tax years 2010 and 2011).[2] The municipality did not file a Counterclaim in any tax year.

During the two-day trial, each party presented an expert real estate appraiser to offer opinions of the true market value of the subject property on the relevant valuation dates. There was no objection to the qualifications of the experts. Although they offered differing opinions with respect to the subject property's highest and best use, both experts relied on the income capitalization approach to determine the true market value of the subject properties. At the start of trial, the parties stipulated to two variables in the income capitalization approach: a market vacancy and collection loss rate (7.5%), and a market expense rate (12.5% of effective gross income). The court accepted those stipulations. The experts also provided consistent testimony that the buildings contain 65,222 square feet for rentable space. Accordingly, three of the five variables of the income capitalization approach were resolved by the parties. The only variables that remained to be determined at trial were market rent and the capitalization rate.

As will be discussed in greater detail below, the experts offered different opinions on the two variables at issue. When the experts applied their opinions of market rent and capitalization

[2] For tax year 2009, N.J.S.A. 54:3-21 permitted a direct appeal to be filed with this court challenging an assessment exceeding $750,000. The statute was amended, effective January 16, 2010, to raise the jurisdictional limit for direct appeals to assessments exceeding $1,000,000. L. 2009, c. 251 § 1. Plaintiff was, therefore, required to initiate its challenges to the tax years 2010 and 2011 assessments before the county board of taxation prior to seeking relief in this court.

rate to the agreed upon variables, the experts offered the following opinions of the combined true

market value of the two parcels:

| Tax Year | 2009 | 2010 | 2011 |
|---|---|---|---|
| Valuation Date | 10/1/2008 | 10/1/2009 | 10/1/2010 |
| | | | |
| Plaintiffs' Expert | $2,484,000 | $2,223,000 | $2,373,000[3] |
| Defendant's Expert | $4,275,000 | $4,216,000 | $4,275,000 |

The parties submitted post-trial written summations.

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments

and judgments of county boards of taxation are entitled to a presumption of validity." MSGW

Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As

Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as

follows:

> The presumption attaches to the quantum of the tax assessment.
> Based on this presumption the appealing taxpayer has the burden of
> proving that the assessment is erroneous. The presumption in favor
> of the taxing authority can be rebutted only by cogent evidence, a
> proposition that has long been settled. The strength of the
> presumption is exemplified by the nature of the evidence that is
> required to overcome it. That evidence must be "definite, positive
> and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413
> (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed

that governmental authority has been exercised correctly and in accordance with law." Pantasote,

supra, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax

---

[3]     Plaintiff's expert offered a separate opinion of true value for each parcel. The values in this chart reflect the combined true market values of the two parcels offered by plaintiff's expert for each tax year.

1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

Plaintiff produced sufficient evidence to overcome the presumption of correctness attached to the assessments, and the county board Judgments at issue here. The opinions of value offered by plaintiff's expert, which were based on an accepted methodology for determining value and on evidence of the type often used for such determinations, if accepted as true, raised doubt in the court's mind with respect to whether the assessments on the subject property exceeded true market for the tax years in question. The expert opined that the subject property had a true market value approximately half that of the implied equalized value reflected by the assessments under review. Plaintiff would be entitled to relief were the opinions of its expert adopted by the court.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

A.     Highest and Best Use.

A determination of the true market value of real property first requires a determination of the property's highest and best use.  In Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015), now Presiding Judge Andresini succinctly explained the legal precedents that guide this court in making a highest and best use determination:

> For property tax assessment purposes, property must be valued at its highest and best use.  Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01, 604 A.2d 580 (1992).  "Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected."  Inmar Associates, Inc. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980).  Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property.  American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 550 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000).  "The concept of highest and best use is not only fundamental to valuation but is a crucial determination of market value.  This is why it is the first and most important step in the valuation process."  Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b. per curiam, 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290, 604 A.2d 580 (1992); see also Gen. Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).
>
> The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal.  Highest and best use is defined as:
>
> > The reasonably probable and legal use of vacant land or improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.
> >
> > [Appraisal Institute, The Appraisal of Real Estate, 22 (13th ed. 2008).]
>
> The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3)

9

financially feasible; and 4) maximally productive. Ford Motor Co., supra, 10 N.J. Tax at 161; see also The Appraisal of Real Estate at 279. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. Township of Edison, 7 N.J. Tax 610, 616-17 (Tax 1985), aff'd o.b. per curiam, 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use of subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., supra, 127 N.J. at 301, 604 A.2d 580. Further, the "actual use is a strong consideration" in the analysis. Ford Motor Co., supra, 10 N.J. Tax at 167.

Highest and best use is not determined through subjective analysis by the property owner. The Appraisal of Real Estate at 279. The proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. See Cherry Hill, Inc. v. Township of Cherry Hill, 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). Additionally, the proposed use must not be remote, speculative, or conjectural. Id. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penn's Grove Gardens, Ltd v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167. Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983).

The parties' experts offered conflicting opinions with respect to the highest and best use of the subject property. Plaintiff's expert opined that the highest and best use of the subject is use as an income-producing property for any industrial or commercial use. He offered the view that the subject property is a standard light industrial/commercial building with average quality office, warehouse, and assembly space amendable to being leased to a variety of light industrial or

commercial tenants. Defendant's expert, on the other hand, opined that the highest and best use of the subject property is use for rental to a tenant who operates a print shop, with associated office and storage space.

The court finds that the limited highest and best use opinion offered by defendant's expert is not credible. The court gleans from the evidence that the expert's highest and best use opinion is based primarily on the air filtration system in place at the subject property, along with the air conditioning system, and the cleanliness of the facility. The expert opined that printing operations require a high level of clean air. He implied, although he did not testify explicitly, that the air filtration system was a fixed component of the real property of sufficient magnitude that the optimal use of the buildings was for printing enterprises.

The expert, however, did not testify that removal of the air filtration system would destroy or severely damage the buildings, or that its installation represents a significant investment. There is, in fact, scant evidence on these points in the trial record. A few photographs of the air filtration units do not support a conclusion that they are permanently affixed to the real property. They instead appear to be hanging from the ceiling by a few thin chains in a limited number of locations and plugged in through electrical outlets in the ceilings. There is no evidence in the record with respect to the cost of installing the system, or the cost, feasibility, or physical consequences of removing it. Nor is there any evidence in the record with respect whether the system would be useful to tenants other than printers.

With respect to the air conditioning and heating system, the court agrees with defendant's expert that building-wide air conditioning and heating is an attractive feature for a light industrial/commercial space. While there is no direct evidence on point in the record, it seems reasonable to conclude that many 1970s vintage warehouse/office buildings are not fully air

conditioned and heated, particularly in the warehouse space. The court concludes that this feature of the subject property is best addressed through adjustments to rents at comparable buildings without air conditioning and heating, and is not a sufficiently distinct characteristic to limit the subject property's highest and best use.

There is simply not enough evidence to support the expert's narrow highest and best use conclusion. The court adopts the highest and best use opinion offered by plaintiff's expert. The subject property's highest and best use as of the relevant valuation dates is for rental for any light industrial or commercial use, which the court determines to be the subject property's current use as of the valuation dates.

B.    Approach to Valuation

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts." 125 Monitor Street, supra, 21 N.J. Tax at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

Both experts relied primarily on the income capitalization approach to valuing the subject property. The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed. 2008). The court finds that the income capitalization approach is the best method for determining the value of the subject property, an income-producing industrial/commercial building.

C.      Calculation of Value Using Income Capitalization Approach

Determining the value of real property pursuant to the income capitalization approach can be summarized as follows:

$$
\begin{array}{ll}
 & \text{Market Rent} \\
\text{x} & \underline{\text{Square Footage}} \\
 & \text{Potential Gross Income} \\
\\
\text{-} & \underline{\text{Vacancy and Collection Losses}} \\
 & \text{Effective Gross Income} \\
\\
\text{-} & \underline{\text{Operating Expenses}} \\
 & \text{Net Operating Income} \\
\\
\div & \underline{\text{Capitalization Rate}} \\
 & \text{Value of Property}
\end{array}
$$

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008).

1.      Market Rent

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270. This

differs from the actual rental income realized on the property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, actual income is a significant probative factor in the inquiry as to economic income. Id. at 30. "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area." Ibid.

Plaintiff's expert identified eight leases from buildings in Union and Middlesex Counties, all but one of which are multi-tenanted buildings, that he considered reflective of market rent for the subject property. Seven of the expert's proffered comparable leases reflect triple net rents, with the tenant paying all but a few expenses. See N.J. Indus. Props., Inc. v. Y.C. & V.L., Inc., 100 N.J. 32, 434 (1985). One of the expert's comparable leases reflects gross rent, with the tenant paying no expenses except tenant electric charges. See American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 572 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000). The expert adjusted the gross rent downward by 20% to make it comparable to a net rent. After application of additional adjustments for location, and building quality, he opined adjusted rents per square foot of

| | |
|---|---|
| Tax Year 2009 | $3.60 to $4.82 |
| Tax Year 2010 | $3.60 to $4.82 |
| Tax Year 2011 | $3.20 to $4.82 |

Based on those comparable rents, the expert opined market rents per square foot of

| | |
|---|---|
| Tax Year 2009 | $4.00 |
| Tax Year 2010 | $4.00 |
| Tax Year 2011 | $4.00 |

Defendant's expert, on the other hand, identified ten leases from buildings in Union County that he considered reflective of market rent for the subject. Seven of the buildings were multi-tenant, with the remaining three single-user. As discussed at greater length above, defendant's expert opined that the subject property had a highest and best use as a tenant-occupied printing operation. His comparable leases, however, were not limited to buildings rented to printers. In fact, none of his comparable leases were for the use he found to be the highest and best use of the subject property. In light of the court's decision to adopt a more general highest and best use – rental for any light industrial or commercial use – the court will consider the comparable leases of defendant's expert, which comport with the court's conclusion of highest and best use.

After application of adjustments for market conditions, size, single occupancy (which the expert considered to be superior), parking, age, condition, and air conditioning, heating and ventilation system at the subject property, he opined adjusted rents per square foot of

Tax Year 2009          $5.16 to $6.95

Tax Year 2010          $4.90 to $7.17

Tax Year 2011          $4.90 to $7.17

Defendant's expert opined market rents of

Tax Year 2009          $6.00

Tax Year 2010          $5.75

Tax Year 2011          $5.75

A crucial consideration for the court is that the lease in place at the subject property on the valuation dates was for $5.71 per square foot. While the court is careful not to consider a lease at the subject property automatically to constitute market rent, lest the court value a leased fee interest

15

as opposed to true market value, an arm's length lease at the subject property may be used by the court to corroborate an opinion of market rent offered by expert appraisers.

Plaintiff's expert did not consider the subject lease at all. He determined the lease to lack credibility as evidence of market rent because, in his view, the lessor and lessee are related parties. There is no convincing evidence in the record that this proposition is accurate. According to the testimony, the lessee, Howard Press, Inc., a subsidiary of Kinkos, which is owned by Federal Express, was purchased from the lessor prior to the commencement of the relevant lease. Plaintiff's expert testified that the lessor's son continued to work for the tenant after the sale. He did not identify the responsibilities of the lessor's son with the tenant or provide any evidence that the rent was adjusted because of the son's position.

Contrary to the expert's position, the lease contains convincing evidence that it is the result of an arm's length negotiation. Express lease clauses establish a detailed procedure in which licensed real estate appraisers will be used to determine a fair market rent for the subject property when the lease is renewed (in the event that the parties do not agree to a fair market rent). These provisions strongly suggest that the rent in place at the subject property is the result of arm's length negotiations. The court will use the rental in the subject lease as corroborative evidence.

The subject lease tends to corroborate the economic rent offered by defendant's expert. The expert opined a market rent slightly higher than the subject lease for tax year 2009, and almost exactly at the subject lease level for tax years 2010 and 2011. The comparable leases of defendant's expert, all from Union County and one in Roselle Borough, are of buildings sufficiently similar to the subject to provide credible evidence of market rent, with appropriate adjustments. Although some of the comparable leases are from properties that are newer than the subject with features more amenable to current business practices in the commercial/warehouse market, plaintiff

16

acknowledges that defendant's comparable leases Nos. 1, 6, 7, 8 & 9 derive from properties that are similar to the subject property. The adjusted rents offered by defendant's expert on those comparable leases are $5.16, $5.13, $6.30, $7.17, and $5.50. These rents create a range into which the rent reflected in the subject lease squarely falls.

The court agrees with plaintiff that a location adjustment to defendant's comparable leases is appropriate, given the location of the subject property in area not readily accessible to major arteries. The roads on which trucks must travel to access Routes 1&9 and the Turnpike from the subject property are, in effect, local roads with traffic lights. Defendant's expert did not make such an adjustment. The negative 5% location adjustment applied by plaintiff's expert to his comparable leases is reasonable. If applied to all of defendant's comparable leases, the adjustment would lead to a 5% reduction in the adjusted rents and, logically, to a 5% reduction in his opinions of economic rents, resulting in economic rents of $5.70 ($6.00 x .95 = $5.70) for tax year 2009, and $5.46 ($5.75 x .95 = $5.46) for tax years 2010 and 2011.

Many of the comparable leases used by plaintiff's expert are from outside Union County. In addition, all but one of the comparable leases are from multi-unit buildings. No evidence was introduced with respect to the feasibility, from physical or economic standpoints, of converting the subject property, which was occupied by a single tenant on the valuation dates, to a multi-tenant property. Plaintiff's expert did not make an adjustment to the multi-tenant rental rates for the single-occupant status of the subject. Defendant's expert made a positive 5% adjustment for this factor, which the court finds to be reasonable. In addition, plaintiff's expert did not make an adjustment for the air conditioning and heating system at the subject, which while not limiting the subject's highest and best use, is a valuable attribute of the subject. Because of these factors, the

17

court considers the analysis of defendant's expert to be more credible, with the adjustments noted above.

In light of these findings, the court concludes a market rent for the subject of $5.50 for each tax year.

2.      Building Size

As noted above, the parties are in agreement that the subject property had 65,222 square feet of rentable space for each of the tax years at issue.

3.      Vacancy and Collection Loss Rate

A determination of value under the income-capitalization approach must include "a vacancy and loss allowance over the economic life of the property, using, in some measure, the actual history, but placing more emphasis on the trends in the most recent years." First Republic Corp. of Am. v. Borough of East Newark, 16 N.J. Tax 568, 580 (App. Div. 1997), aff'd, 17 N.J. Tax 531 (App. Div. 1998). "The important principle implicated in the estimate of a vacancy and loss allowance is that the estimate is simply the appraiser's informed judgment of the long-term and durability of the income stream." Ibid. As Judge Crabtree explained:

> [The] determination involves more than uncritical acceptance of the vacancy rates prevailing in the subject on the valuation dates or, for that matter, the office building vacancy rates prevailing in the subject's market area. Rather, a vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream.
>
> [University Plaza Realty Corp. v. City of Hackensack, 12 N.J. Tax 354, 369 (Tax 1992), aff'd, 264 N.J. Super. 353 (App. Div.), certif. denied, 134 N.J. 481 (1993)(citation omitted).]

The rate should not be "unduly influenced by the experience of the subject property during a period of financial turmoil," but also cannot "totally ignore[] the history of the subject property . . . ." Pine Plaza Assocs., LLC v. Township of Hanover, 16 N.J. Tax 194, 205 (Tax 1996).

18

Here, the parties stipulated to a vacancy and collection loss of 7.5% for each tax year.

    4.        Operating Expenses

The parties stipulated to market expenses of 12.5% of effective gross income for each of the tax years at issue.

    5.        Capitalization Rate

The overall capitalization rate is an "income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value . . . ." Appraisal Institute, The Appraisal of Real Estate at 462. The overall capitalization rate is "used to convert net operating income into an indication of overall property value." Ibid.

Defendant's expert used the Band of Investment technique to calculate an overall capitalization rate. "This technique is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, supra, 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate 467 (10th ed 1992)).

> Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
>
> [Appraisal Institute, Appraisal of Real Estate 505 (13th ed 2008).]

In "using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to

the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Hull Junction Holding, supra, 16 N.J. Tax at 82 (quoting Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 279-80 (1985)). "For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Id. at 82-83. "Relevant data is also collected and published by . . . Korpacz Real Estate Investor Survey." Id. at 83. "By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

Plaintiff's expert used these tools to determine a range of capitalization rates for tax years 2009 and 2010 from 4.3% to 8.5% for properties similar to the subject. He considered the quality, quantity and durability of the income stream and physical characteristics of the subject to warrant a capitalization rate of 8.5%, at the high end of the range, for both tax years. For tax year 2009, he determined a range of capitalization rates from 5.15% to 12% for properties similar to the subject. He opined a capitalization rate of 9.5% for tax year 2011, given the economic downturn generally, and in the real estate market in particular, that began in late 2008 and continued on each of the relevant valuation dates. Those years have been described as "the deepest and longest economic contraction since the Great Depression," defined by "more job losses than any contraction since the Great Depression as well as a painfully slow recovery." Steven A. Ramirez, The Virtues of Private Securities Litigation: An Historic and Macroeconomic Perspective, 45 Loy. U. Chi. L.J. 669, 684-85 (2014).

Defendant's expert, using the same tools opined capitalization rates of 7.0% for tax year 2009, 7.2% for tax year 2010, and 7.1% for tax year 2011. Defendant urges the court to reject the variation of rates reflected in the opinion of plaintiff's expert, given the well-established principle

20

that market data must be stabilized for local property tax purposes.  See Entenmann's, Inc. v. Borough of Totowa, 18 N.J. Tax 540, 555 (Tax 2000).

The court finds that the capitalization rates opined by plaintiff's expert to be credible, given the age and condition of the subject.  The court concludes that the capitalization rates opined by defendant's expert do not adequately reflect the risk involved in the purchase of the subject, given the economic conditions developing as of October 1, 2009 and October 1, 2010, and the age of the property.  The court will stabilize capitalization rates at 8.5% for each tax year.

6.    Calculation of Value

In light of the consistent market rent and capitalization rates determined by the court, as well as the consistent vacancy and collection rate, and market expenses stipulated by the parties, the calculation of value is the same for each tax year:

| | | |
|---|---|---|
| + | Market Rent ($5.50 x 65,222) | $  358,721 |
| | Potential Gross Income (PGI) | $  358,721 |
| | | |
| - | Vacancy & Collection (7.5% PGI) | $    26,904 |
| | Effective Gross Income (EGI) | $  331,817 |
| | | |
| - | Expenses (12.5% of EGI) | $    41,477 |
| | Net Operating Income | $  290,340 |
| | | |
| ÷ | Capitalization Rate | .0850 |
| | Value of Property | $3,415,765 |

The court will round this figure to $3,420,000, which is the true market value of the subject property as of the valuation date for each tax year.

D.    Applying Chapter 123

Pursuant to N.J.S.A. 54:51A-6a, commonly known as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range.  The common level range is defined by

21

N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

The formula for determining the subject property's ratio is:

$$\text{Assessment} \div \text{True Value} = \text{Ratio}$$

In this instance, the aggregate assessments of the two parcels under appeal, $1,819,000 ($869,100 + $949,900 = $1,819,000), will be considered because they are operated as a single economic unit.[4]

1. Tax Year 2009

For tax year 2009, the formula produces a ratio of:

$$\$1,819,000 \div \$3,420,000 = .5319$$

The Chapter 123 common level ratio for Roselle Borough for tax year 2009 is .4232, with an upper limit of .4867 and a lower limit of .3597. The ratio for the subject property for this tax year is .5319, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2009 by multiplying the true value by the Chapter 123 ratio:

$$\$3,420,000 \ \text{x} \ .4231 = \$1,447,002$$

The court will round this figure to $1,447,000. The court will allocate the assessment among the two parcels.

A Judgment establishing the assessment for Block 5301, Lot 1 for tax year 2009 will be entered as follows:

| | |
|---|---|
| Land | $240,000 |
| Improvement | $407,000 |
| Total | $647,000 |

---

[4] As noted above, the court has determined the aggregate true market value of the two parcels.

A Judgment establishing the assessment for Block 5301, Lot 2 for tax year 2009 will be entered as follows:

| Land | $400,000 |
|------|----------|
| Improvement | $400,000 |
| Total | $800,000 |

2.      Tax Year 2010

For tax year 2010, the formula produces a ratio of:

$$\$1,819,000 \div \$3,420,000 = .5319$$

The Chapter 123 common level ratio for Roselle Borough for tax year 2010 is .4322, with an upper limit of .4970 and a lower limit of .3674. The ratio for the subject property for this tax year is .5319, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2010 by multiplying the true value by the Chapter 123 ratio:

$$\$3,420,000 \times .4322 = \$1,478,124$$

The court will round this figure to $1,447,000. The court will allocate the assessment roughly evenly among the two parcels.

A Judgment establishing the assessment for Block 5301, Lot 1 for tax year 2010 will be entered as follows:

| Land | $240,000 |
|------|----------|
| Improvement | $407,000 |
| Total | $647,000 |

A Judgment establishing the assessment for Block 5301, Lot 2 for tax year 2010 will be entered as follows:

| Land | $400,000 |
|------|----------|
| Improvement | $400,000 |
| Total | $800,000 |

23

3.    Tax Year 2011

For tax year 2011, the formula produces a ratio of:

$$\$1,819,000 \div \$3,420,000 = .5319$$

The Chapter 123 common level ratio for Roselle Borough for tax year 2011 is .4707, with an upper limit of .5413 and a lower limit of .4001.  The ratio for the subject property for this tax year is .5319, which is within the common level range.  No adjustment to the assessments is warranted.  The court will enter a Judgment affirming the Judgments of the county board of taxation for tax year 2011.