**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

June 25, 2025

Chad E. Wolf, Esq.
Wolf Vespasiano, LLC
331 Main Street
Chatham, New Jersey 07083

Wesley E. Buirkle, Esq.
Joseph Sordillo, Esq.
DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

      Re:    <u>Croft, Robert v. Montclair Township</u>
              Docket Nos. 006061-2022 and 002341-2023

Dear Mr. Wolf, Mr. Buirkle, and Mr. Sordillo:

This letter shall constitute the court's opinion following trial of the above-referenced local property tax appeals. Plaintiff, Robert Croft ("plaintiff") challenges the 2022 and 2023 tax year assessments on his mixed-use property in Montclair Township ("Montclair").

For the reasons stated herein, the court finds that for the 2022 and 2023 tax years, the subject property's ratio of assessed value to true value falls within the upper limit and lower limit of Montclair's Chapter 123 corridor. Accordingly, the court shall enter judgments dismissing plaintiff's 2022 and 2023 tax year complaints and Montclair's counterclaims.

## I.    <u>Procedural History and Factual Findings</u>

As of the valuation dates at issue, plaintiff was the owner of the property at Belden Place Rear, Montclair, New Jersey. The property is identified on Montclair's tax map as Block 803, Lots 10, 11, and 12 (the "subject property"). The subject property is improved with an "L" shaped









one-story and part two-story brick and wood-frame, multi-tenanted mixed-use building, in average condition.[1]  Plaintiff timely filed complaints challenging only the 2022 and 2023 tax year assessments on Lot 10.[2]  Montclair filed counterclaims for the 2022 and 2023 tax years.  The court tried these matters to conclusion over two days.

The subject property is in the Upper Montclair section of the taxing district, between Laurel Place and Emerson Place, and between the New Jersey Transit Commuter Rail tracks and Valley Road.  Notably however, the subject property does not have any frontage along Valley Road.  Rather, access to the subject property is provided by a 40-foot wide by 165-foot-long right of way easement from Valley Road creating Beldon Place (a private road).  The subject property is surrounded by detached one and two-family homes, only feet from the Mountain Avenue New Jersey Transit Commuter Rail Station, approximately seven blocks from the Upper Montclair business district, and approximately one mile south of Montclair State University.

The subject property's building was initially constructed in approximately 1880, with an

---

[1]  The building is on Block 803, Lot 10 ("Lot 10"), with approximately one foot of the building on Block 803, Lot 11 ("Lot 11").  A right-of-way easement and private drive connects Valley Road to Lot 11, which provides egress to and from, and parking for the subject property's building. Block 803, Lot 12 ("Lot 12") contains a small area of macadam but is otherwise undeveloped.

[2]  The subject property's total tax assessments exceed $1,000,000.  Thus, under N.J.S.A. 54:3-21, "a taxpayer feeling aggrieved by the assessed valuation . . . of the taxpayer's property . . . , may on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed . . . , whichever is later, file a complaint directly with the Tax Court, if the assessed valuation of the property subject to the appeal exceeds $1,000,000."  Here, it is undisputed that plaintiff did not timely file appeals challenging the tax assessments on Lot 11 and Lot 12. Therefore, the court finds that it lacks jurisdiction to review the Lot 11 and Lot 12 tax assessments. However, that does not preclude the court from reviewing the tax assessment on Lot 10.  As stated in Universal Folding Box Co. v. City of Hoboken, 19 N.J. Tax 141 (Tax 2000), aff'd, 351 N.J. Super. 227 (App. Div. 2002), where separately assessed parcels are considered a single economic unit, the failure to establish jurisdiction in this court to review the assessment on one of the parcels does not preclude the court's review of the tax assessment on the others.  Instead, the court must determine the combined value of the parcels as a single economic unit and then extract from that figure the value allocable to the parcel not under review. Id. at 150.






addition constructed sometime during the 1990's. The building comprises approximately 7,801 gross square feet and is divided into five street-level office units ranging in size from 800 to 1,500 square feet, and a second floor residential apartment.[3] The office units are designated as follows: (i) Unit 10, comprising 1,400 square feet of open office area, one bathroom, and a loft area;[4] (2) Unit 20, comprising 900 square feet of open office area, and one bathroom; (3) Unit 30, comprising 1,000 square feet, two private offices, one bathroom, and a former dark room; (4) Unit 40, comprising 1,500 square feet of open office area, and one bathroom; and (5) Unit 50, comprising 800 square feet, and is further subdivided into five individually partitioned offices of approximately 125 square feet each, and has two bathrooms.[5] Except for Unit 50, which has a shared entrance, each office unit has its own private exterior entrance. In addition, the building contains a second floor 1,764 square foot residential apartment, identified as Unit 35, comprising six rooms, with two bedrooms, and two full bathrooms. The subject property has a surface macadam parking area with a capacity for approximately twenty vehicles.

The office units are generally finished with painted sheetrock walls, suspended grid type composition tile ceilings, flush mounted, recessed or suspended lighting fixtures, and carpeted or painted concrete flooring. All units are separately metered for electric service. In addition, except

---

[3] One office unit is subdivided into five separate and individually partitioned smaller offices.

[4] According to plaintiff's expert, the loft area has a five-foot ceiling height.

[5] Although the experts agreed that the subject property's building contains 7,801 gross square feet, conflicting testimony was offered regarding its leasable square footage. According to plaintiff's expert, the subject property's building consists of 6,037 square feet of leasable office area and a 1,764 square foot apartment. According to Montclair's expert, the subject property consists of 5,600 square feet of leasable office area and a 1,500 square foot apartment. However, Montclair's expert was unable to inspect the apartment. The court's review of the subject property's rent rolls accounts for 5,600 square feet of leasable office area. Accordingly, the court finds that the subject property's building comprises 7,801 gross square feet of which 5,600 square feet is leasable office, 1,764 square feet is for the apartment, and 437 square feet is common or not leasable area.






for Units 30 and 35, each unit features its own individual gas-fired HVAC unit. Units 30 and 35 share a single gas-fired hot water baseboard heating system.

The subject property is in Montclair's R-2 Two Family Residence zoning district with permitted principal uses that include one and two-family dwellings. Thus, use of the subject property as a multi-tenanted, mixed-use building is a pre-existing legally permitted use.

Lot 12 is principally in Special Flood Hazard Area A, denoting a "100-year flood" area with a "1-percent annual chance [of] flood[ing]."[6] Lot 10 and Lot 11 are in Special Flood Hazard Area X, denoting a "moderate flood hazard area" with a "0.2 percent-annual-chance" of flooding.[7]

During trial, plaintiff and Montclair each offered testimony from a New Jersey certified general real estate appraiser, who were accepted by the court as experts in property valuation. Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true or market value. Both experts valued Lot 10, Lot 11, and Lot 12 as a single economic unit. As of each valuation date, the subject property's local property tax assessments, implied equalized values, and the experts' value conclusions are set forth below:

| Valuation dates | Tax assessments[8] | Average ratio of assessed to true value | Implied equalized Value | Plaintiff's expert | Montclair's expert |
|---|---|---|---|---|---|
| 10/1/2021 | $1,320,300 | 82.54% | $1,599,588 | $1,045,000 | $1,890,000 |
| 10/1/2022 | $1,320,300 | 72.47% | $1,821,857 | $1,065,000 | $1,830,000 |

The experts' review of the subject property's rent rolls, as of the October 1, 2021 and October 1, 2022 valuation dates revealed the following:

---

[6] https://www.fema.gov/glossary/flood-zones.
[7] https://www.fema.gov/glossary/flood-zones.
[8] Including the $30,200 land only assessment imposed on Lot 11 and $41,300 land only assessment imposed on Lot 12.





October 1, 2021

| Unit | Tenant | Lease date | Rent P.S.F. |
|---|---|---|---|
| Units 10 & 20 | UMBC | February 2019 | $25.47 |
| Unit 30 | Vacant | - | - |
| Unit 35 (Apartment) | Vacant | - | - |
| Unit 40 | Birdling Bags | June 2018 | $28.00 |
| Unit 50 - 1 | Angeli | April 2013 | $45.00 |
| Unit 50 - 2 | Gozia | October 2003 | $45.00 |
| Unit 50 - 3 | Carla | December 2019 | $56.25 |
| Unit 50 - 4 | Vacant | - | - |
| Unit 50 - 5 | Vacant | - | - |

October 1, 2022

| Unit | Tenant | Lease date | Rent P.S.F. |
|---|---|---|---|
| Units 10 & 20 | UMBC | February 2019 | $25.47 |
| Unit 30 | Vacant | - | - |
| Unit 35 (Apartment) | Vacant | - | - |
| Unit 40 | Birdling Bags | June 2018 | $28.40 |
| Unit 50 - 1 | Angeli | April 2013 | $45.00 |
| Unit 50 - 2 | Gozia | October 2003 | $45.00 |
| Unit 50 - 3 | Carla | December 2019 | $56.25 |
| Unit 50 - 4 | Legacy | December 2021 | $56.25 |
| Unit 50 - 5 | Vacant | - | - |

## II. Conclusions of Law

### A. Presumption of validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that






raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of plaintiff's proofs, Montclair moved to dismiss these matters under R. 4:37-2(b), arguing that: (i) the sheer volume of changes and corrections made by plaintiff's expert to his appraisal report and value conclusions wholly undermined the credibility of his appraisal report and testimony; (ii) plaintiff's expert's failure to offer any independent evidence of the value of Lot 11 and Lot 12, including any comparable vacant land sales, rendered his value conclusions deficient; and (iii) the comparable office leases employed by plaintiff's expert to derive his economic or market rent were physically different from the subject property's units and plaintiff's expert failed to apply appropriate adjustments to account for these differences. The court denied Montclair's motion and placed a statement of reasons on the record. Without restating the court's






ruling herein, although the court was concerned with the scope and breadth of the corrections and modifications made by plaintiff's expert to his appraisal report and the comparable office leases offered in support of his conclusions, the court found that, at that stage in the proceedings, it must afford plaintiff all reasonable and legitimate inferences that could be deduced from the evidence presented. Based on that standard, the court was satisfied that plaintiff produced sufficient cogent evidence to overcome the presumption of validity. The opinions of plaintiff's expert, if accepted as true, raised debatable questions as to the validity of the subject property's tax assessments.

However, concluding that a plaintiff has overcome the presumption of validity does not necessarily equate to the court finding that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court emphasizes that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

      B.   Highest and best use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use analysis is a concept rooted in the market's perceptions of value because it answers the inquiry, "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). To accurately answer that question, an appraiser must conduct "a comprehensive market analysis to ascertain the supply and demand characteristics of alternative






uses." Clemente, 27 N.J. Tax at 269. Thus, the highest and best use analysis is the starting point in the court's journey to discern a property's true or fair market value. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis is "the first and most important step in the valuation process").[9]

Here, in conducting his highest and best use, as vacant, analysis, plaintiff's expert expressed that "maybe you can get four [building] lots, maybe, but two or three of them are going to be completely in a flood zone, not likely to ever sell in my opinion, . . . and depending on roads, I am not an engineer, so, I did not see a feasibility of any other alternative use to tear down our subject property to build something else."[10] Thus, plaintiff's expert concluded that the highest and best use of the subject property, as vacant, is to "develop [it] as a commercial facility, as is, given that a use variance is allowed."[11] Additionally, finding that there were no alternative uses that would be maximally productive, plaintiff's expert concluded that the highest and best use of the subject property, as improved, is for its present use as a multi-tenanted, mixed-use building.

Montclair's expert explained that the subject property's current improvements and use as

---

[9] Plaintiff's expert testified that on October 4, 2024, plaintiff entered in a contract to sell the subject property for $2,900,000. However, plaintiff's expert expressed that the contract was contingent upon the buyer obtaining approval to construct 40-60 multi-family units. Testimony was further elicited during trial that on February 21, 2025, the contract was terminated.

[10] In plaintiff's expert opinion, Lot 12 was surplus land and did not contribute anything to the value of the subject property. According to plaintiff's expert, development of Lot 12 would require subdivision and granting a "d(2) variance" for the subject property. In addition to the variance, due to Lot 12 being partially in a flood hazard area, plaintiff's expert expressed that it would require setbacks for development. Thus, although subdivision may be physically possible, in his opinion, development of Lot 12 would not be legally possible and financially feasible.

[11] During the court's questioning, plaintiff's expert conceded that he did not review the approvals granted for the subject property and was unaware if the "sliver" of macadam on Lot 12 was necessary for the operation of the mixed-use building on Lot 10 and Lot 11. Moreover, plaintiff's expert did not review the right-of-way easement creating Belden Place, and thus, he did not know whether the agreement afforded access to Lot 12, independent of the access to Lot 10 and Lot 11.






a multi-tenanted, mixed-use building pre-dates Montclair's adoption of the zoning ordinance. Thus, after reviewing the legally permissible, physically possible, financially feasible, and maximally productive uses for the subject property, Montclair's expert concluded that the subject property's highest and best use, as vacant, is for multi-family residential development in accordance with Montclair's R-2, Two Family Residence zoning district requirements. According to Montclair expert, in preforming his highest and best use, as vacant, analysis "I am looking at this property just basically as, 3 two-family lots until there is some sort of approvals or an application has been made." In addition, after reviewing the potential alternative uses for the subject property, he found that no other uses would support removal of the existing improvements. Thus, he concluded that the subject property's highest and best use, as improved, is continuation of its existing use as a multi-tenanted, mixed-use building. However, Montclair's expert emphasized that he views the existing use of the subject property as an interim or temporary highest and best use, as improved, until development of the subject property with multi-family dwellings is permitted.

The court finds Montclair's expert's highest and best use, as vacant, as a multi-family residential development in accordance with Montclair's R-2, Two Family Residence zoning district requirements, to be more credible. The trial testimony revealed that the subject property is in Montclair's R-2, Two Family Residence zoning district, with permitted uses that include one and two-family dwellings. Plaintiff's expert offered no support for his conclusion that there was a reasonable probability that, if vacant, a use variance would be granted to develop the subject property as a commercial facility.

However, the court agrees with both experts, that the subject property's highest and best use, as improved, is continuation of its existing use as a multi-tenanted, mixed-use building.






C.    Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980).  "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Borough, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)).  The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Here, both plaintiff's expert and Montclair's expert concluded, and the court agrees that the income capitalization approach is the most appropriate method to derive the subject property's true or market value.

1.    Income capitalization approach

When a property is income-producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, L.L.C. v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018).  "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert[s] these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th






ed. 2013).

Fundamental to the income capitalization approach is the concept of anticipation, a process designed to forecast future economic benefits and convert those benefits into a present value estimate. Id. at 440. In essence, the income capitalization approach converts the anticipated stream of a property's income and the reversionary benefit into a present value. First Republic Corp. of Am. v. E. Newark Borough, 16 N.J. Tax 568, 578 (Tax 1997) (stating that the value of "income-producing real estate is based on the income it will produce in the future . . . the principle of anticipation, [is] the present worth of future benefits").

a. Economic or market rent

In undertaking the income-capitalization approach, an appraiser is charged with the responsibility of determining a property's potential gross income. This requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 270 (1987). The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). By accurately determining a property's economic or market rent, an appraiser can forecast the anticipated revenue stream to be generated by that property and convert that future income stream into a present value. First Republic Corp. of Am., 16 N.J. Tax at 578.

i. Plaintiff's expert

The court emphasizes that it is well-settled that the weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion






can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980) (internal citations omitted).

Here during trial plaintiff offered into evidence sixteen (16) revised pages to plaintiff's expert's appraisal report representing corrections, modifications, and deletions to plaintiff's expert's original appraisal report that were apparently identified by plaintiff's expert in preparation of trial. While several of the corrections, modifications, and deletions were relatively minor, several changes impacted plaintiff's expert's identified office comparable leases, office unadjusted effective rents, adjustments, office adjusted effective rents, and overall valuation conclusions. For example, plaintiff's expert deleted in its entirely one of his office comparable leases, made corrections to the reported effective rents for two of his remaining six office comparable leases, made corrections to the lease type and expense structure for three of his remaining six office comparable leases, made corrections to his paired office analysis adjustments, applied additional adjustments to three of his remaining six office comparable leases, made corrections and adjusted upwards the reconstructed Potential Gross Income attributable to the subject property for the 2022 and 2023 tax years, made corrections and adjusted upwards the reconstructed Effective Gross Income attributable to the subject property for the 2022 and 2023 tax years, and made corrections and adjusted upwards his value conclusions for the subject property.

The scope and breadth of such corrections, modifications, and deletions evinces what the court would characterize as a lack of diligence or oversight in collecting or accurately verifying the office comparable lease data that he relied on to generate his appraisal report. An indispensable component of the income capitalization approach is "the appraiser's scrutiny, evaluation and analysis of data, information, statistics, costs, and a property's capacity to generate future benefits to determine the 'market rent' or fair rental value' of a property. VBV Realty, LLC v. Scotch






Plains Twp., 29 N.J. Tax 548, 560 (Tax 2017) (citing Parkway Village Apartments Co., 108 N.J. at 270). Appraisers must "ensure that their appraisal reports 'conform to the Uniform Standards of Professional Appraisal Practice (USPAP) in effect on the date which the appraisal was prepared. . .' N.J.A.C. 13:40A-6.1. These standards require appraisers to 'correctly complete research and analysis necessary to produce a credible result.'" VBV Realty, LLC, 29 N.J. Tax at 561 (quoting The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standards Rule 1 (2012-2013 ed.)).

That is not to say that making corrections and/or amendments to appraisal reports during trial is uncommon in the Tax Court. See Worden-Hoidal Funeral Homes, Inc. v. Red Bank Borough, 21 N.J. Tax 336 (Tax 2004). The court readily acknowledges that the appraisal process is reliant on information reported by other real estate professionals, buyers, sellers, and attorneys. Thus, the pathway of appraisal report preparation can be littered with potential pitfalls that, if inadvertently adopted or accepted, may produce results that are inconsistent with the market. Rather, the foundation or hallmark of a reliable appraisal report and value conclusion rests upon the appraiser's knowledge and understanding of the marketplace from data that is observed, thoroughly verified, and collected. "Ultimately, it is for the trier of fact to determine 'the evidential value and weight to be given to the testimony of conflicting experts . . . and this weight depends upon their candor, intelligence, knowledge, experience and especially upon the facts and reasoning which are offered as the foundation of their respective opinions.'" Id. at 350 (quoting Coastal Eagle Point Oil Co. v. West Deptford Twp., 13 N.J. Tax 242, 299-300 (1993), aff'd, 15 N.J. Tax 190 (App. Div. 1995)).

Here, the scope of the corrections made by plaintiff's expert during trial causes the court to pause and consider the reliability of plaintiff's expert's data verification process and reported






office lease information. It casts doubt on the credibility, trustworthiness, and weight which the court should afford the market or economic rent conclusions ascribed by plaintiff's expert to the subject property's office areas and to his overall value conclusions.[12]

In discerning his market or economic rent for the subject property's office area, plaintiff's expert's appraisal report identified seven office comparable leases.[13] The office leases are:

| Lease | Address | Lease date | Leased area | Effective rent P.S.F. | Lease type |
|---|---|---|---|---|---|
| 1 | 292 Bloomfield Ave. Montclair, NJ | March 2021 | 3,000 sq. ft. | $24.00 | Gross plus utilities* |
| 2 | 218 Bloomfield Ave. Montclair, NJ | May 2021 | 800 sq. ft. | $27.00 | Gross plus utilities* |
| 3 | 258 Park Street Montclair, NJ | September 2021 | 750 sq. ft. | $20.80 | Gross |
| 4 | 398-408 Bloomfield Ave. Montclair, NJ | December 2021 | 1,400 sq. ft. | $18.86* | Gross plus utilities |
| 5 | 398-408 Bloomfield Ave. Montclair, NJ | January 2022 | 1,000 sq. ft. | $22.80* | Gross plus utilities* |
| 6 | 309 Orange Road Montclair, NJ | March 2022 | 750 sq. ft. | $19.00 | Modified gross |

* Reflects corrections or modifications made by plaintiff's expert to his appraisal report during trial.

Plaintiff's expert relied on office comparable leases 1, 2, 3, and 4, for the 2022 tax year, and on office comparable leases 2, 3, 4, 5, and 6, for the 2023 tax year.

In plaintiff's expert's opinion the subject property's market supports a modified gross lease type. Thus, plaintiff's expert applied a downward adjustment of $2.00 per square foot to office comparable lease 3 to account for differences in lease expense structure.[14] In addition, plaintiff's expert applied an upwards adjustment of $2.83 per square foot to office comparable lease 4, and

---

[12] Contrary to assertions in plaintiff's counsel's post-trial brief, the court was not "annoyed" by plaintiff's expert's corrections. Rather, during trial, the court permitted plaintiff's expert to offer testimony regarding the corrections made to 16 pages of his appraisal report. However, as trier of fact, the court must gauge the evidentiary value and weight that is to be accorded plaintiff's expert's testimony, including the corrections and amendments to his value conclusions.

[13] During trial, plaintiff's expert omitted one of his seven comparable office leases because when he attempted to verify the lease data prior to trial, he ascertained that the lease "never happened."

[14] Reflects a correction made by plaintiff's expert to his appraisal report during trial.






an upwards adjustment of $3.42 per square feet to office comparable lease 5, to account for their lack of off-street parking.[15] Plaintiff's expert applied no other adjustments.

After applying his adjustments, plaintiff's expert's range of adjusted effective rents for the office comparable leases was $18.80 to $27.00 per square foot (with a mean of $22.87 P.S.F. and median of $22.85 P.S.F.), as of the October 1, 2021 valuation date; and $18.80 to $27.00 per square foot (with a mean of $22.92 P.S.F. and median of $21.69 P.S.F.), as of the October 1, 2022 valuation date. Ultimately, plaintiff's expert concluded a market or economic rent for the subject property's office areas, on a gross rental basis, of: (i) $23.00 per square foot, as of the October 1, 2021 valuation date; and (ii) $24.00 per square foot, as of the October 1, 2022 valuation date. However, in calculating the subject property's reconstructed potential gross income, plaintiff's expert then added $2.00 per square foot for tenant utilities. Thus, his overall market or economic rent was $25.00 per square foot, as of the October 1, 2021 valuation date, and $26.00 per square foot, as of the October 1, 2022 valuation date.

To discern his market or economic rent for the subject property's apartment unit, plaintiff's expert identified six apartment comparable leases. The apartment comparable leases are:

| Lease | Address | Lease date | Leased area | Monthly rent | Rooms - Bedrooms - Baths |
|---|---|---|---|---|---|
| 1 | 192-194 Bloomfield Ave. Montclair, NJ | October 2021 | 1,400 sq. ft. | $3,000 | 4 - 2 - 2 |
| 2 | 192-194 Bloomfield Ave. Montclair, NJ | July 2021 | 1,395 sq. ft. | $3,000 | 4 - 2 - 2 |
| 3 | 50 Pine Street Montclair, NJ | September 2021 | 1,540 sq. ft. | $3,000 | 7 - 2 - 2 |
| 4 | 23 New Street Montclair, NJ | January 2022 | 1,426 sq. ft. | $3,300 | 5 - 2 - 2 |
| 5 | 21 New Street Montclair, NJ | November 2022 | 1,758 sq. ft. | $3,675 | 5 - 2 - 2 |
| 6 | 192-194 Bloomfield Ave. Montclair, NJ | July 2022 | 1,395 sq. ft. | $3,000 | 4 - 2 - 2 |

---

[15] Reflects a correction made by plaintiff's expert to his appraisal report during trial.

   

Plaintiff's expert relied on apartment comparable leases 1, 2, and 3, for the 2022 tax year, and relied on apartment comparable leases 4, 5, and 6, for the 2023 tax year. Plaintiff's expert applied no adjustments to his apartment comparable leases. Plaintiff's expert concluded a market or economic rent for the subject property's apartment unit of: (i) $3,000 per month, as of the October 1, 2021 valuation date; and (ii) $3,250 per month, as of the October 1, 2022 valuation date.

ii. Montclair's expert

To discern the market or economic rent for the subject property's office area, Montclair's expert's appraisal report identified five comparable office leases.[16] Montclair's expert's office comparable leases are:

| Lease[17] | Address | Lease date | Leased area | Effective rent P.S.F. | Lease type |
|---|---|---|---|---|---|
| 2 | 52 Fairfield Street, Montclair, NJ | December 2017 | 2,431 sq. ft. | $33.46 | Modified gross |
| 4 | 250 Bellevue Avenue Montclair, NJ | May 2022 | 2,000 sq. ft. | $24.36 | Modified gross |
| 5 | 100 Valley Road Montclair, NJ | July 2021 | 150 sq. ft. | $48.00 | Modified gross |

Montclair's expert relied on all three office comparable leases for the 2022 and 2023 tax years to arrive at his market or economic rent for the subject property's office space.

According to Montclair's expert, the subject property's market supports a modified gross lease type. In Montclair's expert's opinion the office comparable leases were timely as of both valuation dates, substantially similar in size to the subject property's office areas and share the

---

[16] During trial, Montclair's expert withdrew from consideration comparable office leases 1 and 3. He explained that, although he believes all of his five office comparable leases accurately reflected the economic or market rent in Montclair as of each valuation date, because office comparable leases 1 and 3 ended on or about the valuation dates involved in these matters, that they were not necessarily timely for consideration by the court.

[17] As identified under Montclair's expert's appraisal report.






same general market as the subject property, thus no adjustments were warranted. Thus, Montclair's expert's range of effective rents was $24.36 to $48.00 per square foot, as of the October 1, 2021 and October 1, 2022 valuation dates. Montclair's expert concluded a market rent, on a modified gross basis, of $35.00 per square foot for the subject property's office areas.

To discern his market or economic rent for the subject property's apartment unit, Montclair's expert identified seven apartment comparable leases. Montclair's expert's apartment comparable leases are:

| Lease | Address | Lease date | Monthly rent | Rooms - Bedrooms - Baths |
|---|---|---|---|---|
| 1 | 242 Bellevue Ave. Montclair, NJ | June 2021 | $1,900 | 5 - 2 - 1 |
| 2 | 485 Valley Road Montclair, NJ | September 2021 | $2,500 | 6 - 2 – 1 |
| 3 | 242 Bellevue Ave. Montclair, NJ | June 2021 | $2,100 | 5 - 2 – 1 |
| 4 | 622-624 Valley Road Montclair, NJ | January 2021 | $2,300 | 4 - 2 - 2 |
| 5 | 224 Lorraine Ave. Montclair, NJ | November 2022 | $2,000 | 4 - 2 – 1 |
| 6 | 598 Valley Road Montclair, NJ | October 2023 | $2,750 | 5 - 2 - 1 |
| 7 | 127 Watchung Ave. Montclair, NJ | October 2023 | $2,400 | 4 - 2 - 1 |

Montclair expert relied on all seven apartment comparable leases to discern the market or economic rent for the subject property's apartment unit as of the October 1, 2021 and October 1, 2022 valuation dates. Montclair's expert applied no adjustments to his apartment comparable leases. Montclair's expert concluded a market or economic rent for the subject property's apartment unit of $2,300 per month, as of the October 1, 2021, and October 1, 2022 valuation dates.

### iii. Court's analysis

The court finds that its analysis of the market or economic rent is driven by two inter-






related components: (i) the physical characteristics of the subject property; and (ii) what the marketplace's reaction is to those different physical characteristics. Here, the undisputed testimony revealed that as of the October 1, 2021 and October 1, 2022 valuation dates, the subject property comprised two different and distinct office types. The first, comprises a more traditional office space, ranging in size from 900 to 1,500 square feet, with adequate area for either multiple employees or product storage (Units 10, 20, 30, and 40). The second, comprises individually partitioned offices, consisting of approximately 125 square feet each, with space for one professional or employee (Units 50-1 to 50-5).

### a. Individually partitioned offices

The court's review of the subject property's rent rolls, plaintiff's expert's testimony, and Montclair's expert's testimony during trial confirms that individually portioned offices in Montclair garner very different economic or market rents. Testimony was elicited during trial from plaintiff's expert that, in December 2019 and December 2021, the plaintiff rented the individually partitioned offices, Unit 50-3 and 50-4, on a gross basis, for $56.25 per square foot. In addition, Montclair's expert's offered testimony and evidence that his office comparable lease 5, comprising an individually partitioned office of 150 square feet, rented in July 2021, on a modified gross basis, for $48.00 per square foot. Thus, the range of effective rents for the subdivided and individually partitioned offices were $48.00 to $56.25 per square foot unadjusted.[18] This represents a stark contrast from the range of effective or market rents for the traditional offices of $18.86 to $33.46 per square foot unadjusted. Accordingly, the court finds

---

[18] The subject property's individually partitioned office rentals at $56.25 per square foot are under a gross lease. Thus, if the court applied its adopted tenant utility charge of $1.88 per square foot (as set forth herein), the individually partitioned office rents for Unit 50 are $58.13 per square foot.






that a separate and distinct economic or market rent must be ascribed to these two different types of office areas in the subject property.

The court finds that the actual rent plaintiff negotiated in December 2019 and again in December 2021 with two separate tenants for the subject property's individually partitioned offices, in arms-length transactions, is credible evidence of economic or market rent. That data, coupled with Montclair's expert's office comparable lease 5, demonstrates a range of economic or market rent for the individually partitioned offices in the Montclair marketplace of $48.00 to $56.25 per square foot unadjusted (and $58.13 per square foot adjusted for tenant utilities). Accordingly, the court finds that the five individually partitioned offices in Unit 50, should be ascribed a market or economic rent, on a modified gross basis, of $56.00 per square foot. The court will apply the $56.00 market or economic rent to Unit 50's 800 square feet of leasable area.

b.     Traditional office space

According to plaintiff's expert, the effective rents for his six office comparable leases ranged from $18.86 to $27.00 per square foot unadjusted. However, effective cross-examination revealed that the rents identified by plaintiff's expert reflect only the starting rents reported by CoStar, not the effective rents under the leases. Moreover, plaintiff's expert did not possess copies of any of the office comparable lease agreements and did not know if there were rent increases or rent step-ups under any of his office comparable leases, or what those rent increases were.

As explained above, the income-capitalization approach is premised on the conversion of an anticipated stream of income into a present value. As cogently explained by Judge Crabtree,

> Value is created by the <u>anticipation of future benefits</u>. The value of income-producing real estate is based on the income it will produce in the future. <u>Failure to consider future income contradicts the principle of anticipation, i.e., the present worth of future benefits. The ultimate concern is the future, and while current income is a</u>






> good starting point, the direction and expected rate of income change are critical to the capitalization of income as a valuation approach.
>
> Accordingly, where income changes are known, as is the case with step-up leases, those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser's estimate of the property's future income. The rationale for the step-up lease is the landlord's willingness to accept smaller rent in the early years to assist a tenant in establishing a new business or an old business in a new location. The step-up lease may also reflect the owner's recognition of tenant expenditures, which are, in effect, amortized over the early years of the lease when rent payments are smaller.
>
> [First Republic Corp. of Am., 16 N.J. Tax at 578 (internal citations omitted) (emphasis added).]

Effective rent is defined as "[t]he rental rate net of financial concessions such as periods of free rent during the lease term. . . ." The Appraisal of Real Estate, at 448. Although our courts have consistently found that "economic rent [must] reflect[] rent concessions, which are supported by comparable leases . . . as well as current leases in the subject property itself," no rigid formula has been adopted delineating how "effective" rent should be calculated. Glen Pointe Associates v. Teaneck Twp., 10 N.J. Tax 506, 522 fn3 (Tax 1989), aff'd, 12 N.J. Tax 127 (App. Div. 1991). See also Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 579 (Tax 1991) (concluding that "[i]t is necessary to consider rent concessions in arriving at economic rent").

According to one treatise, effective rent "may be calculated in several different ways. It may be estimated based on rental income from existing leases at market rates and terms, or rental income from leases at market rates and terms, depending on the intended use of the appraisal." Appraisal Institute, The Appraisal of Real Estate, 422 (15th ed. 2020). Therefore, pivotal to calculating "effective" rent is the appraiser's analysis of the marketplace. Only through the appraiser's comprehensive analysis of leases in the marketplace can he or she discern the






anticipated income stream and future economic benefit that a property owner reasonably expects to derive.

Thus, when the leases in a marketplace customarily contain rent step-ups, rent concessions, or other financial incentives, the valuation expert must account for these factors in discerning the economic or market rent and stabilized expenses because they materially impact the anticipated income stream. Thus, the "effective" rent calculation is intended to serve as an analytical tool enabling appraisers to weigh, distinguish, differentiate, and reconcile lease terms, rent step-up provisions, and other financial concessions under comparable leases, to assist the appraiser in developing a credible economic or market rent. This analysis pays deference to the principal that under the income capitalization approach, the present value must account for the future economic benefits to be received by the property owner over the anticipated lease term.

Accordingly, when undertaking an analysis of effective rents in the marketplace, the valuation expert's investigation must include: (i) an in-depth scrutiny of the comparable and competitive leases in the marketplace; (ii) data regarding the typical term of those leases to gauge the anticipated length of the income flow; (iii) what, if any, step-up rent is payable under the leases; (iv) an analysis of whether the step-up rent accurately reflects market or economic rent; and (v) what are typical and atypical financial or rent concessions in the marketplace.

Here, in arriving at the effective rent for his six office comparable leases, plaintiff's expert limited his consideration to only the rent payable at the outset of each lease, without any consideration as to whether the Montclair submarket dictated that there should be rent increases or step-ups over the lease term. Therefore, plaintiff's expert's identification of only the rent payable at the commencement of the lease without consideration of what the rent increases or step-ups are over the lease term fails to adequately consider the anticipated revenue stream, and potential






expectations of office building property owners in the Montclair submarket.

Although commercial real estate information websites like CoStar may be a valuable resource and starting point for appraisers to identify potential comparable properties in the marketplace, it is the process by which an appraiser makes inquiry into the lease terms and verifies the accuracy of the data and information reported that is the hallmark of an effective appraisal report and sound opinion of value. See VBV Realty, LLC, 29 N.J. Tax 548. As concisely and eloquently expressed by Judge Crabtree, "[t]he probative quality of an expert's opinion depends not only upon the facts offered in support of that opinion, but also upon the persuasive character of the expert's analysis." Harrison Realty Corp. v. Harrison Town, 16 N.J. Tax 375, 383 (Tax 1997), aff'd per curiam, 17 N.J. Tax 174 (App. Div. 1997).

Plaintiff's expert offered no testimony or evidence during trial demonstrating whether rent increases or step-ups are typical in the Montclair office marketplace, and what, if any, rent increases or step-ups were payable under any of his office comparable leases. A credible identification and disclosure of the effective rents in the marketplace is necessary under the income capitalization approach to discern the present worth of the anticipated revenue stream. "[W]hile current income is a good starting point, the direction and expected rate of income change are critical to the capitalization of income as a valuation approach." First Republic Corp. of Am., 16 N.J. Tax at 578. Cross-examination of plaintiff's expert disclosed that he failed to investigate or ascertain the effective rent under any of his six office comparable leases, choosing instead to accept the starting rent as the effective rent. Accordingly, for the above-stated reasons the court is unable to accord plaintiff's expert's office comparable leases and thus, his office economic or market rent conclusions any weight.

Conversely, Montclair's expert took the "average" annual rent or "average over term" of






the annual rents under his two traditional office comparable leases, in reporting the effective rents. Montclair's expert's effective rents were $33.46 and $24.36 per square foot. The court's review of Montclair's expert's office comparable lease 2 discloses that it bears a December 1, 2017 commencement date, is in a mixed-use building initially constructed in 1937 and modernized, is in proximity to the Watchung Avenue New Jersey Transit Commuter Rail Station. In addition, the court's review of Montclair's expert's office comparable lease 4 discloses that it bears a May 1, 2022 commencement date, is in a mixed-use building initially constructed in 1960 and renovated in 2014 and is in near proximity to the Upper Montclair New Jersey Transit Commuter Rail Station. Thus, both office comparable leases offered by Montclair's expert share several key physical and location attributes with the subject property. Therefore, the court finds Montclair's expert's office comparable lease 2 ($33.46 P.S.F.) and office comparable lease 4 ($24.36 P.S.F.) to be credible and reliable evidence of the economic or market rent of more traditional office space in the Montclair market. The court emphasizes that it places the greatest weight on Montclair's expert's office comparable lease 4 because that property is approximately six blocks from the subject property and bore a commencement date that is closest in time to the valuation dates involved herein.[19] Accordingly, the court finds that an economic or market rent of $27.50 per square foot should be ascribed to the subject property's traditional office space, on a modified gross lease basis.

### c. Apartment unit

The court's review of the photographs of the subject property's apartment unit discloses that it is a sizeable apartment, comprising between 1,500 to 1,764 square feet, consisting of six

---

[19] The court ascribes the following weight: (i) 65% to office comparable lease 4; and (ii) 35% to office comparable 2.






rooms, with two bedrooms, and two full bathrooms, with high ceilings. The photographs further depict a kitchen outfitted with stainless steel appliances.

The court's review of plaintiff's expert's six apartment leases discloses that they are all in Montclair, bearing a striking size similarity to the subject property's apartment unit, ranging in size from 1,395 to 1,758 square feet. Notably, all of plaintiff's expert's apartment comparable leases possess two bedrooms and two bathrooms, like the subject property's apartment unit. Further, plaintiff's expert's apartment comparable leases commenced between October 2021 and November 2022, thus, they were all timely for the valuation dates involved herein.

In contrast, only Montclair's expert's apartment comparable lease 4 possesses two bathrooms, Montclair's expert's remaining six apartment comparable leases possess only one bathroom. Additionally, although Montclair's expert offered testimony regarding the number of rooms in each of his seven apartment comparable leases, he did not furnish the court with their square footage. Thus, it is difficult for the court to gauge whether Montclair's expert's apartment comparable leases were similar in size to the subject property's apartment unit, and thus, truly comparable to and competitive in the Montclair market with the subject property's apartment unit.

Accordingly, for the above-stated reasons, the court attributes the greatest weight to plaintiff's expert's apartment comparable leases and little weight to Montclair's expert's apartment comparable leases. After reviewing and analyzing the data and testimony, the court accepts plaintiff's expert's conclusions of the economic or market rent that should be attributed to the subject property's apartment unit. Therefore, the court will apply a monthly rent of $3,000 to the subject property's apartment unit, as of the October 1, 2021 valuation date, and a monthly rent of $3,250 to the subject property's apartment unit, as of the October 1, 2022 valuation date.






b.    Vacancy and collection loss factor

Here, in discerning the vacancy and collection loss factors that are to be applied to the subject property's reconstructed potential gross incomes, both plaintiff's expert and Montclair's expert analyzed the subject property's historical occupancy rates and published data from CoStar in the Urban Essex Office market for the 3rd Quarter 2021 and 3rd Quarter 2022.  In addition, plaintiff's expert reviewed published data from CoStar in the Essex County Office market and Essex County apartment market for the 3rd Quarter 2021 and 3rd Quarter 2022.

After reviewing the data and information, both plaintiff's expert and Montclair's expert concluded that a seven and one-half (7.5%) percent vacancy and collection loss factor was reasonable for the 2022 tax year.  Plaintiff's expert similarly opined that a seven and one-half (7.5%) percent vacancy and collection loss factor was reasonable for the 2023 tax year.  In contrast, Montclair's expert's opined that a six and one-half (6.5%) percent vacancy and collection loss factor was reasonable for the 2023 tax year.

The court's review of the CoStar data reveals that, in the 3rd Quarter 2022, the office vacancy rates were: (i) 10% in Essex County; (ii) 3.71% in the Essex County market for 2-star office facilities; (iii) 4.30% in the Urban Essex Submarket; and (iv) 2.6% in the Urban Essex County Submarket for 2-star office facilities.  Moreover, the apartment vacancy rates in the 3rd Quarter 2022 among the same categories identified above ranged from 3.03% to 4.27%.  The subject property is not in the Urban Essex Submarket but rather is in the Suburban Essex Submarket.  Thus, the court finds that the published data supports plaintiff's expert's seven and one-half (7.5%) percent concluded vacancy and collection loss factor for the 2023 tax year.

Accordingly, the court will apply a seven and one-half (7.5%) percent vacancy and collection loss factor to the subject property's reconstructed gross potential income for both the






2022 and 2023 tax years.

   c.  Tenant improvement allowance

  In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement/fit-up allowances. Often, the cost of a tenant improvement allowance is built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474.

  According to plaintiff's expert, tenant improvement allowances are customary for office buildings operated in the subject property's market area. In his opinion, a tenant improvement allowance of $1.50 per square foot should be accounted for on the subject property's reconstructed operating statement.

  However, effective cross-examination disclosed that plaintiff's expert's discussions with the leasing agents for all his six office comparable leases revealed that none of the office comparable leases afforded any tenant improvement allowance. Thus, although plaintiff's expert asserted that tenant improvement allowances are customary in the Montclair office market, none of the office comparable leases plaintiff's expert relied on afforded any tenant improvement allowance. Moreover, the court's review of the four reconstructed operating statements furnished by plaintiff's expert in support of his proposed stabilized expenses, disclose that none of the four properties reported any tenant improvement allowance.

  Conversely, Montclair's expert testified that based on an examination of his office comparable leases and his knowledge of the Montclair office market, tenant improvement






allowances are generally not provided. Thus, he concluded that no tenant important allowance was warranted for the subject property. During cross-examination, Montclair's expert acknowledged that his appraisal report's description for office comparable lease 2 states that the landlord provided "an unspecified dollar amount to the tenant for work letter." However, he credibly explained that no dollar amount was attached to work letter, but the work letter included only repairs to the HVAC system and interior painting that were "extremely nominal" or "minimal."

The court finds the cross-examination testimony elicited from plaintiff's expert, along with Montclair's expert's office comparable lease data and testimony, on this issue, to be the most telling. Other than for nominal expenses, none of the office comparable leases offered by plaintiff's expert or Montclair's expert demonstrated that tenant improvement allowances are afforded in Montclair's office marketplace. Although plaintiff's expert opined that tenant improvement allowances are customary in the subject property's office market, he offered no data or evidence supporting such opinion. Therefore, the court declines to apply a tenant improvement allowance in these matters.

d.    Stabilization

Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." First Republic Corp. of America, 16 N.J. Tax at 579 (Tax 1997) (citing The Dictionary of Real Estate Appraisal, 344-45 (3rd ed. 1993)). Consistent with that principle, under the income capitalization approach, an appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised. The Appraisal of Real Estate, at 453. As part of that analysis, an appraiser prepares a reconstructed operating






statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." Ibid. Through an examination and analysis of a property's historical income and expense data, when measured against comparable properties in the marketplace, an appraiser can discern the potential future performance of the property over its economic life.

Here, both experts concluded that a stabilized structural reserve expense of two percent (2%) of effective gross income was reasonable. The court finds that the testimony and evidence support the experts' conclusions. Accordingly, the court will accept and apply a stabilized two percent (2%) structural reserve expense to the subject property's reconstructed effective gross income for the 2022 and 2023 tax years.

In addition to the stabilized structural reserve expense, in plaintiff's expert's opinion, the following expenses should be stabilized and deducted from the subject property's reconstructed effective gross income: (i) management expenses of 5%; (ii) administration expenses of $0.50 per square foot; (iii) utility expenses of $2.48 per square foot; (iv) maintenance and repair expenses of $2.75 per square foot; (v) insurance expenses of $0.74 per square foot; (vi) miscellaneous expenses of 1%; and (vii) leasing commission expenses of 5%[20] To ascertain the stabilized expenses, plaintiff's expert reviewed the subject property's 2019 to 2022 tax year operating statements, published data from the Institute of Real Estate Management ("IREM"), and the operating statements of four office buildings he viewed as comparable to the subject property.[21]

---

[20] Plaintiff's expert only applied the administration, utilities, maintenance and repair, and insurance expenses to his estimated 6,037 square feet of office area in the subject property's building. However, for reasons unclear to the court, plaintiff's expert attributed no administration, utilities, maintenance and repair, and insurance expenses to the 1,764 square foot apartment.
[21] The four comparable office buildings were in Montclair, Glen Ridge, Paramus, and Glen Rock, and ranged in size from 16,765 to 22,140 square feet.





According to Montclair's expert, in addition to the stabilized structural reserve expense, the following expenses should be stabilized and deducted from the subject property's reconstructed effective gross income: (i) management expenses of 3.5%; (ii) leasing commission expenses of 3%; and (iii) general operating expenses of $3.75 per square foot.[22] To determine these amounts, Montclair's expert examined the subject property's operating expenses and office building expenses that he characterized as being "customary in the market."

At the outset, the court highlights that, certain expenses identified on the subject property's operating statements, as reported in plaintiff's expert's appraisal report, have wide-ranging values. For example, in the 2019 tax year, plaintiff reported repair expenses of $38,343, however, during the 2020 to 2022 tax years, plaintiff reported repair expenses ranging between $2,293 to $9,483. Thus, the court questions whether some of the expenses categorized as repairs in the 2019 tax year should have been more appropriately categorized as capital improvements. Similarly, during the 2022 tax year plaintiff reported supply expenses of $20,086, however, during the 2019 to 2021 tax years plaintiff reported supply expenses ranging between $0.00 to $6,873. Further, for the 2021 tax year plaintiff apparently reported computer and network expenses of $6,322, however during the 2022 tax year reported computer and network support expenses of $0.00.

Moreover, the court's analysis of the subject property's insurance expenses reveals an average cost of approximately $0.74 per square foot of office area. In sharp contrast, plaintiff's

---

[22] Montclair's expert attributed the $3.75 per square foot operating expense to the entire 7,801 square feet of the subject property's building. Montclair's expert arrived at the $3.75 per square foot value by accepting the actual operating expenses reported on plaintiff's 2022 U.S. Individual Income Tax Return, Form 1040, Schedule E, excluding those categorized as "Auto and travel," "Mortgage interest," "Supplies," "Taxes," and "Depreciation." Those expenses totaled $29,245, and Montclair's expert divided that amount by the building's 7,801 square feet to discern the $3.75 per square foot value.

   

expert's comparable office expense properties insurance expenses ranged from $0.40 to $0.56 per square foot, and IREM reported an average insurance expense of $0.24 per square foot. No explanation was offered by plaintiff's expert for this significant discrepancy. Thus, the court finds that plaintiff's actual reported operating expenses for repairs, supplies, computer networking, and insurance are not reliable evidence of stabilized operating expenses.

Accordingly, after considering the experts' testimony, reviewing the subject property's operating statements, plaintiff's expert's four comparable office buildings' operating statements, and the IREM data, the court finds that the following stabilized expenses should be attributed to the subject property: (i) management and administration expenses of 5.50% of the reconstructed effective gross income, or approximately $1.39 per square foot;[23] (ii) a leasing commission expense of 3% of the reconstructed effective gross income;[24] (iii) utility expenses of $1.88 per square foot;[25] (iv) maintenance and repair expenses of $2.75 per square foot;[26] and (v) insurance

---

[23] The subject property reported no management expenses during any prior tax year and average administration expenses of $8,674 or approximately $1.00 per square foot of gross building area. IREM reported combined management and administration expenses of $1.36 per square foot.

[24] The subject property reported no leasing commission expenses during any prior tax year. Moreover, the court's review of plaintiff's expert's four comparable office expense properties reveals leasing commission expenses ranging from 0.85% to 11.87% of effective gross income. The court finds that a stabilized leasing commission expense of 3% of the reconstructed effective gross income would accurately account for any leasing commission expense.

[25] IREM reported average utility expenses of $1.88 per square foot. According to plaintiff's expert, the subject property's utility expenses averaged $2.48 per square foot over a four-year period. However, plaintiff's expert's calculation excluded the utilities for the subject property's apartment, which plaintiff paid and were included in the total utility bills. Thus, the court's calculation reveals that the utilities were: (i) $1.68 per square foot in 2019 ($13,090/7,801 sq. ft. = $1.68); (ii) $1.92 per square foot in 2020 ($14,985/7,801 sq. ft. = $1.92); (iii) $2.23 per square foot in 2021 ($17,365/7,801 sq. ft. = $2.23); and (iv) $1.85 per square foot in 2022 ($14,480/7,801 sq. ft. = $1.85). Accordingly, the court accepts the IREM utility expenses of $1.88 per square foot.

[26] The subject property reported actual maintenance and repair expenses ranging from $1.28 to $5.62 per square foot of gross building area over a four-year period. Moreover, IREM reported repair and maintenance expenses of $2.89 per square foot. The court accepts plaintiff's expert's opined $2.75 per square foot stabilized maintenance and repair expense.






expenses of $0.40 per square foot.[27]  The court affords no miscellaneous expense.[28]

  e.  <u>Capitalization</u>

The direct capitalization approach "convert[s] an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor."  <u>The Appraisal of Real Estate</u>, at 491; <u>Hull Junction Holding Corp.</u>, 16 N.J. Tax at 80-81.  Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, to derive their capitalization rates, plaintiff's expert and Montclair's expert both undertook a review of published data, including investor surveys.[29]  Both experts employed the band of investment technique and reviewed published capitalization rates in deriving their capitalization rates.[30]

Notably, the RERC Real Estate Reports and PwC investor surveys reflect a forecast of regional and institutional investors required or expected equity return on a 100% cash

---

[27]  IREM reported an insurance expense of $0.40 per square foot.  Plaintiff's expert's four comparable office expense properties reported insurance expenses ranging from $0.40 to $0.56 per square foot.

[28]  Plaintiff's expert offered little evidence supporting his 1% miscellaneous expense.  According to plaintiff's expert, the subject property reported no miscellaneous expenses during the prior four-year period and two of plaintiff's expert's expense comparable properties reported no miscellaneous expense.

[29]  Both experts relied on ACLI Investment Bulletins, PwC Investor Surveys, and the U.S. Department of the Treasury's published treasury yields.  In addition, plaintiff's expert relied on Real Estate Research Corporation's ("RERC") Real Estate Reports.  Montclair's expert also relied on a term sheet provided by a local bank containing mortgage interest rates and terms.

[30]  The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.'  The technique includes both a mortgage and an equity component."  <u>Hull Junction Holding Corp.</u>, 16 N.J. Tax at 80-81 (quoting Appraisal Institute, <u>The Appraisal of Real Estate</u>, 467 (10th ed 1992)).

   

transaction.[31]   Stated differently, "[t]he RERC and [PwC] Korpacz data is based upon all cash transactions."   Hull Junction Holding Corp., 16 N.J. Tax at 102 (emphasis added). However, the band of investment technique employs both a mortgage financing component, and a cash equity investment component.   Thus, as keenly observed by Judge Kuskin, "[w]here the cash investment, *i.e.,* the equity investment, is only 25%-30% of the total investment, the equity dividend rate would tend to be lower than the all[-]cash rate."   Ibid.   Accordingly, the court finds that the equity dividend and capitalization rates reflected in the RERC Real Estate Reports and PwC investor surveys are not necessarily an accurate gauge of the equity dividend and capitalization rates that would be employed in a transaction involving between 60% to 70% mortgage financing, as opined by the experts in these matters.

Additionally, the court emphasizes that RERC defines net operating income as the "current income of a property net of all operating expenses, but before any reserves, debt service, capital expenditures, tenant improvements and leasing commissions" (emphasis added).[32]   Thus, in calculating the capitalization rates reported under the RERC Real Estate Reports, a property's annual real estate taxes have been deducted from its gross income.   However, it is a well-settled principle of New Jersey local property tax valuation that "[i]nclusion of real estate taxes as an operating expense is not permitted because the amount of real estate taxes are ultimately determined as a result of this court's finding of value. . . ."   Spiegel v. Town of Harrison, 18 N.J. Tax 416, 427 (Tax 1999).   In sum, the court finds that the capitalization rates promulgated by RERC are not an accurate representation of capitalization rates that would be employed in New Jersey Tax Court matters.

---

[31]   https://rerc.com/img/sample-realestate.pdf.
[32]   https://rerc.com/img/sample-realestate.pdf.






Plaintiff's expert concluded the following base capitalization rates: (i) 6.90%, as of the October 1, 2021 valuation date (3.25% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.50% equity dividend rate); and (ii) 7.70%, as of the October 1, 2022 valuation date (5.00% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.75% equity dividend rate).

Montclair's expert concluded the following base capitalization rates: (i) 5.797%, as of the October 1, 2021 valuation date (4.50% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 3.76% equity dividend rate); and (ii) 6.412%, as of October 1, 2022 valuation date (4.50% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 5.81% equity dividend rate).

The court's own review and analysis of the data reveals that, as of the October 1, 2021 valuation date, the ACLI Investment Bulletins reported office interest rates ranging from 2.74% to 3.65%, loan-to-value ratios of 52.24% to 58.52%, and capitalization rates from 4.21% to 6.85% 7.15%.[33] In addition, the 10-year Treasury yields were 1.48% and the 30-year Treasury yields were 2.04%.[34] Finally, the local bank term-sheet relied on by Montclair's expert reveals that, as of October 1, 2021: (i) mixed-use/retail properties bore interest rates ranging from 4% to 4.25%, loan amortization periods of 25 to 30 years, and loan-to-value ratios of 70% to 75%; and (ii) office/industrial properties bore interest rates ranging from 4% to 4.25%, loan amortization periods of 25 to 30 years, and loan-to-value ratios of 70% to 75%.

---

[33] ACLI Investment Bulletins for Fixed Rate Office: (i) Less than $2 Million; (ii) Mid-Atlantic; (iii) New Jersey; and (iv) New York-New Jersey-Connecticut-Pennsylvania.
[34] PwC's National Suburban Office Market capitalization rates were 3.60% to 9.00%, with an average of 6.07%. RERC's East Second-Tier Investment Properties Suburban Office equity dividend rates were 7.5% to 11%.






As of the October 1, 2022 valuation date, the ACLI Investment Bulletins reported office interest rates ranging from 4.40% to 5.13%, loan-to-value ratios of 52.93% to 64.72%, and capitalization rates of 4.87% to 6.84%.[35] In addition, the 10-year Treasury yields were 3.83% and the 30-year Treasury yields were 3.79%.[36] Finally, the local bank term-sheet relied on by Montclair's expert reveals that, as of October 1, 2022: (i) mixed-use/retail properties bore interest rates ranging from 3.875% to 4.75%, loan amortization periods of 25 to 30 years, and loan-to-value ratios of 70% to 75%; and (ii) office/industrial properties had interest rates ranging from 3.875% to 4.75%, loan amortization periods of 25 to 30 years, and loan-to-value ratios of 70% to 75%.

Accordingly, based on a review of the above data and information, as well as the experts' testimony and opinions, the court finds that, as of the October 1, 2021 valuation date, plaintiff's expert's 60% loan-to-value ratio is more credible, both experts' concluded twenty-five (25) year amortization period is reasonable, a 4.00% interest rate is most credible, and a 5.00% equity dividend rate should be applied. Additionally, the court finds that, as of the October 1, 2022 valuation date, Montclair's expert's 4.50% interest rate is more credible, plaintiff's expert's 60% loan-to-value ratio is more credible, and both experts' concluded twenty-five (25) year amortization period is reasonable, and a 6.50% equity dividend rate is most credible.

Thus, the base capitalization rate, as of the October 1, 2021 valuation date should be 5.80% (4% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 5.00%

---

[35] ACLI Investment Bulletins for Fixed Rate Office: (i) Less than $2 Million; (ii) Mid-Atlantic; (iii) New Jersey; and (iv) New York-New Jersey-Connecticut-Pennsylvania.
[36] PwC's National Suburban Office Market capitalization rates were 3.60% to 9.00%, with an average of 6.07%. RERC's East Second-Tier Investment Properties Suburban Office equity dividend rates were 7.5% to 11%.






equity dividend rate).[37]   In addition, as of the October 1, 2022 valuation date, the base

capitalization rate should be 6.60% (4.50% interest rate, 60% loan-to-value ratio, twenty-five (25)

year amortization period, and 6.50% equity dividend rate) should be employed. [38]

Accordingly, the subject property's reconstructed operating statements for the 2022 and

2023 tax years are set forth on the next page:

(the balance of this page is left intentionally blank)

---

[37]  6.334% constant x 60% = 3.80%; 5% x 40% = 2%; 3.80% + 2% = 5.80%.
[38]  6.67% constant x 60% = 4%; 6.50% x 40% = 2.60%; 4% + 2.60% = 6.60%.






**2022 Tax Year**

INCOME:

| | | |
|---|---|---:|
| 4,800 square feet office @ $27.50 PSF | | $132,000 |
| 800 square feet individual offices @ $56.00 PSF | | $ 44,800 |
| Apartment unit @ $3,000 per month | | $ 36,000 |
| Total: | Potential Gross Income (PGI) | $212,800 |
| Less: | Vacancy & Collection loss @ 7.50% PGI | ($ 15,960) |
| Total: | Effective Gross Income (EGI) | $196,840 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---:|
| Utilities | 3,001 sq. ft.[39] | @ 1.88 PSF | $ 5,642 |
| Maintenance and Repairs | 7,801 sq. ft. | @ $2.75 PSF | $21,453 |
| Insurance | 7,801 sq. ft. | @ $0.40 PSF | $ 3,120 |
| Leasing Commissions | | @ 3% of EGI | $ 5,905 |
| Management/Administration | | @ 5.5% of EGI | $10,826 |
| Replacement Reserves | | @ 2% of EGI | $ 3,937 |
| Total: | | | ($50,883) |

| | | |
|---|---|---:|
| NET OPERATING INCOME: | | $145,957 |

| | |
|---|---|
| 2022 BASE CAPITALIZATION RATE: | 5.80% |
| 2022 EFFECTIVE TAX RATE: | 2.669% |
| 2022 LOADED CAPITALIZATION RATE: | 8.469% |

| | | |
|---|---|---:|
| 2022 CONCLUDED VALUE: | $145,957 / 0.08469 | $1,723,427 |

---

[39] Representing the utilities for the subject property's building's common or non-leasable areas (437 sq. ft), the apartment unit (1,764 sq. ft.) and Unit 50 (800 sq. ft). During trial, the experts testified that the subject property's office areas are leased on a gross plus tenant electric, or modified gross basis, with the tenant responsible for utility charges. Testimony further disclosed that the comparable apartment units are leased on a gross plus tenant electric basis. The testimony further disclosed that each unit is separately metered for electric. Moreover, according to Montclair's expert, "each unit is served with individual gas fired HVAC." However, no testimony was elicited during trial revealing whether each unit is also separately metered for natural gas. In addition, Montclair's expert indicated that the apartment unit and Unit 50 share a "single gas fired hot water baseboard heating system." Testimony was also elicited during trial that plaintiff pays the utility expenses for Unit 50 and the apartment unit. Although the court acknowledges that some portion of the $1.88 per square foot utility expenses are attributable to the apartment's electricity charges which would be paid by the tenant, there is inadequate evidence in the record to enable the court to parse out the apartment's electricity expense from the overall utility expense.




**2023 Tax Year**

INCOME:

| | | |
|---|---|---|
| 4,800 square feet office @ $27.50 PSF | | $132,000 |
| 800 square feet individual offices @ $56.00 PSF | | $ 44,800 |
| Apartment unit @ $3,250 per month | | $ 39,000 |
| Total: | Potential Gross Income (PGI) | $215,800 |
| Less: | Vacancy & Collection loss @ 7.50% PGI | ($ 16,185) |
| Total: | Effective Gross Income (EGI) | $199,615 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Utilities | 3,001 sq. ft.[40] | @ 1.88 PSF | $ 5,642 |
| Maintenance and Repairs | 7,801 sq. ft. | @ $2.75 PSF | $21,453 |
| Insurance | 7,801 sq. ft. | @ $0.40 PSF | $ 3,120 |
| Leasing Commissions | | @ 3% of EGI | $ 5,988 |
| Management/Administration | | @ 5.5% of EGI | $10,979 |
| Replacement Reserves | | @ 2% of EGI | $ 3,992 |
| Total: | | | ($51,174) |

NET OPERATING INCOME:   $148,441

| | | |
|---|---|---|
| 2023 BASE CAPITALIZATION RATE: | 6.60% | |
| 2023 EFFECTIVE TAX RATE: | 2.449% | |
| 2023 LOADED CAPITALIZATION RATE: | 9.049% | |
| | | |
| 2023 CONCLUDED VALUE: | $148,441 / .09049 | $1,640,413 |

Accordingly, the court finds the total true or fair market value of Lots 10, 11, and 12 to be: (i) $1,723,427, as of the October 1, 2021 valuation date; and (ii) $1,640,413, as of the October 1, 2022 valuation date. However, as highlighted above, plaintiff's tax appeals challenge only the 2022 and 2023 tax year assessments on Lot 10. Here, the court attributes a true or market value to Lot 11's land of $39,000 and to Lot 12's land of $53,000, for each tax year. Therefore, the court finds the true or fair market value of Lot 10 to be: (i) $1,631,427, as of the October 1, 2021 valuation date; and (ii) $1,548,413, as of the October 1, 2022 valuation date.

---

[40] See footnote 37.






   2. <u>Local Property Tax Assessment</u>

  Having reached conclusions of the subject property's true or market value, the court turns its attention to determining if adjustments to the subject property's 2022 and 2023 tax year assessments are warranted.

  Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

  For the 2022 tax year, Lot 10's ratio of assessed value, $1,248,800, to true market value, $1,631,427, yields a ratio of 76.55% ($1,248,800/$1,631,427 = 76.55%), which falls between Montclair's upper limit (94.92%) and lower limit (70.16%) of the 2022 tax year Chapter 123 common level range. Consequently, no adjustment in the 2022 local property tax assessment on Lot 10 is warranted.

  For the 2023 tax year, Lot 10's ratio of assessed value, $1,248,800, to true market value, $1,548,413, yields a ratio of 80.65% ($1,248,800/$1,548,413 = 80.65%), which falls between Montclair's upper limit (83.34%) and lower limit (61.60%) of the 2023 tax year Chapter 123 common level range. Consequently, no adjustment in the 2023 local property tax assessment on Lot 10 is warranted.






Accordingly, contemporaneous herewith the court shall enter judgments dismissing plaintiff's 2022 and 2023 complaints and Montclair's counterclaims.

Very truly yours,

/s/

Hon. Joshua D. Novin, J.T.C.

